88 N.Y.2d 674 (1996)
673 N.E.2d 98
649 N.Y.S.2d 903
In the Matter of David Griffin, Appellant,
v.
Thomas A. Coughlin, III, as Commissioner of the New York State Department of Correctional Services, et al., Respondents.
Court of Appeals of the State of New York.
Argued February 15, 1996.
Decided June 11, 1996.
Robert N. Isseks, Middletown, and Alex Smith for appellant.
Dennis C. Vacco, Attorney-General, Albany (Julie S. Mereson, Victoria A. Graffeo and Peter H. Schiff of counsel), for respondents.
Marc D. Stern, New York City, and Lois C. Waldman for The American Jewish Congress, amicus curiae.
Chief Judge KAYE and Judges SIMONS, TITONE and SMITH concur with Judge LEVINE; Judge BELLACOSA dissents and votes to affirm in a separate opinion in which Judge CIPARICK concurs.
*677 LEVINE, J.
On this appeal we hold that, under the Establishment Clause of the United States Constitution's First Amendment, an atheist or agnostic inmate may not be deprived of eligibility for expanded family visitation privileges for refusing to participate in the sole alcohol and drug addiction program at his State correctional facility when the program necessarily entails mandatory attendance at and participation in a curriculum which adopts in major part the religious-oriented practices and precepts of Alcoholics Anonymous (hereinafter A.A.). Thus, we reverse the order of the Appellate Division and grant judgment in favor of petitioner prohibiting respondents from conditioning petitioner's participation in the Family Reunion Program on attendance in the subject Alcohol and Substance Abuse Treatment Program (hereinafter ASAT Program) as presently constituted.
In so holding, we in no way denigrate the proven effectiveness of the A.A. approach to alcoholism or drug addiction rehabilitation, nor do we imply that State correctional authorities must discontinue the present ASAT Program if it were conducted on a voluntary basis, or that they could not include a noncoercive use of A.A.'s 12-step regimen as part of an alternative prisoner drug and alcohol abuse treatment effort. Likewise, we have no doubt that the Department of Correctional Services could validly construct a rehabilitation model containing incentives and penalties, as in the ASAT Program, providing it offered a secular alternative to the A.A. component. In that way, the State could maintain the neutrality required by the Establishment Clause (see, Walz v Tax Commn., 397 US 664, 673; see also, Bowen v Kendrick, 487 US 589, 606-608).

Facts
Petitioner, an inmate serving a sentence of imprisonment in the State correctional system, was transferred to the Shawangunk Correctional Facility, Ulster County, in May 1991. In his petition in this CPLR article 78 proceeding, he alleged that, prior to this transfer, he had been approved for participation in the Family Reunion Program. Upon arrival at the Shawangunk Facility, he was told that because his criminal history revealed his use of heroin between 1955 and 1968, his continued eligibility for the Family Reunion Program would be contingent on his participation in the ASAT Program at the facility.
*678 After attendance at the ASAT Program for several months, petitioner submitted a grievance requesting that he be excused from further involvement in ASAT without forfeiting his right to participate in the Family Reunion Program. Petitioner had a long-time documented history of having declared himself an atheist or agnostic to correctional authorities. He complained that the ASAT Program he had been attending was based upon religious principles embodied in the "Twelve Steps"[1] and "Twelve Traditions" credos of Alcoholics Anonymous, thereby violating "the portion of the First Amendment of the U.S. Constitution that requires a separation between Church and State." He attached both manifestos to his grievance.
A member of the facility's grievance committee initially responded to petitioner's grievance that "[a]t this time the facility does not offer a substance abuse program (therapeutic) without a religious background." He later averred that, at that time, he was unfamiliar with the actual workings of the ASAT Program and based his conclusion that it was religion-oriented solely upon his reading the Twelve Steps and Twelve Traditions submitted with petitioner's grievance.
Petitioner's grievance was denied. After exhausting all administrative opportunities for relief, he brought this CPLR *679 article 78 proceeding seeking a judgment annulling the determination and requiring respondents to discontinue the requirement of petitioner's attendance in the "religious" program in order to remain eligible for participation in the Family Reunion Program. Petitioner also alleged that, at a hearing with Shawangunk Facility authorities, both staff and inmate representatives acknowledged that the ASAT Program at the facility was a religious program.
Respondents' answering papers conceded that a major emphasis of the ASAT Program was the inmate's participation in self-help groups conducted by A.A. or Narcotics Anonymous (N.A.)[2] volunteers pursuant to A.A.'s Twelve Steps and fully employing the A.A. meeting methodology. Respondents averred that the A.A. practices and precepts have proven to be the most effective method for preventing relapse of the recovering alcoholic or chemical substance abuser. The answering papers characterized the utilization of A.A. and N.A. group practices as a "state of the art" major component of any addiction program. Pointing to A.A. literature,[3] respondents averred that the references to God actually mean some "higher power as the individual may understand such higher power," not as the concept would be known by "organized religions." Thus, respondents claimed that the A.A. component of the ASAT Program "does not make specific references to God as an institutional religion would wherein the individual is required to worship, praise, give thanks or petition to a Creator" (Affidavit of Lorraine Cohen, Senior Correctional Counselor for ASAT, NY St Dept of Correctional Servs).
Supreme Court dismissed the petition without affording petitioner a hearing to develop a record of the facts underlying his complaint. The Appellate Division affirmed (211 AD2d 187). As previously noted, the Appellate Division relied upon the A.A. Big Book and the A.A. Twelve Steps/Twelve Traditions *680 texts to find that, despite the repeated references to "God" in the Twelve Steps and Twelve Traditions, A.A. does not "`demand'" adherence to any particular faith but to "`spirituality'" and "`open mindedness'" (id., at 190 [quoting the A.A. Big Book and A.A. Twelve Steps/Twelve Traditions]). The Court also found quite significant that A.A. allows participants to select their own conception of God, as shown by the reference in Step 3 to "God as we understood Him."
On the foregoing basis, the Appellate Division concluded that petitioner's documentary evidence did not establish that the A.A. component of the ASAT Program was a religious exercise violating the Establishment Clause. Absent proof of a more sectarian actual practice at the A.A. meetings petitioner was required to attend, the Court held that his petition was properly dismissed. We granted petitioner leave to appeal the Appellate Division's ruling and now reverse.

Analysis
In our view, the Appellate Division erred in rejecting the petition in this case by applying too narrow a concept of religion or religious activity for Establishment Clause analysis and disregarding the compulsion used to induce petitioner to attend and participate in A.A. meetings heavily laced with atleast general religious content. Moreover, even if we were to agree with the Appellate Division's holding that the governing principles and practices of A.A., as incorporated in the ASAT Program, do not necessarily require an atheist participant to accept the existence of God in the religious sense, or to engage in religious activity, we would, nonetheless, find that the mandatory and exclusive incorporation of A.A. doctrine and practices in the ASAT program violates Establishment Clause principles requiring governmental neutrality with respect to religion (see, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, 512 US 687, 696-697; Abington School Dist. v Schempp, 374 US 203, 222), and prohibiting governmental endorsement of religion (Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet, supra; Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 592-593; Lemon v Kurtzman, 403 US 602, 612).

I
A reading of the ASAT Program Operations Manual reveals  and respondents do not dispute  that essential major *681 components, indeed, the heart of the program, are the A.A. Twelve Step manifesto itself and inmate participation in the group sessions conducted by A.A. and N.A. volunteers utilizing the A.A. modus operandi. Thus, the ASAT Program Manual lists in its "Mission Statement" its purpose to prepare addicted inmates to return to the community and to reduce recidivism "by providing education and counseling on continued abstinence * * * and participation in self-help groups based on the `12-step' approach." The Manual designates as the first element of the "philosophy" of the ASAT Program the "12-step approach," i.e., "a set of principles which teach an individual how to build a life based on sobriety." Adopting the basic A.A. methodology, the ASAT Program's "Philosophy" declares the effectiveness of "working the 12 suggested steps [which] * * * act as a guide * * * to build a new way of life without the use of alcohol and/or drugs, one day at a time" (emphasis supplied). The Manual describes the ASAT Program content as including education and counseling with a curriculum based upon the "`12-step' approach to recovery."
Concededly, there are passages in A.A. literature, relied upon heavily by respondents, the Appellate Division and the dissent here, which, in stressing the openness and inclusiveness of the A.A. movement, eschew any intent to impose a particular sectarian set of beliefs or a particular concept of God upon participants. However, a fair reading of the fundamental A.A. doctrinal writings discloses that their dominant theme is unequivocally religious, certainly in the broad definitional sense as "manifesting faithful devotion to an acknowledged ultimate reality or deity" (Webster's 9th New Collegiate Dictionary 995 [9th ed 1990]). Indeed, the A.A. basic literature most reasonably would be characterized as reflecting the traditional elements common to most theistic religions. Thus, God is named or referred to in five of the 12 steps. "Working" the 12 steps includes confessing to God the "nature of our wrongs" (Step 5), appealing to God "to remove our shortcomings" (Step 7) and seeking "through prayer and meditation" to make "contact" with God and achieve "knowledge of His Will" (Step 11 [emphasis supplied]). The 12 Traditions include a profession of belief that "there is one ultimate authority  a loving God as He may express Himself in our group conscience."
While A.A. literature declares an openness and tolerance for each participant's personal vision of God ("as we understood Him" [Steps 3 and 11] [emphasis in the original]), the writings demonstrably express an aspiration that each member of the *682 movement will ultimately commit to a belief in the existence of a Supreme Being of independent higher reality than humankind. Thus, in the A.A. Big Book  the basic text of A.A.  chapter l, "Bill's Story," describes the spiritual transformation of one of the cofounders of A.A., in which he finally achieved salvation from his alcoholism: by "enter[ing] upon a new relationship with my Creator * * * [i]t meant destruction of self-centeredness. I must turn in all things to the Father of Light who presides over us all" (A.A. Big Book, at 13-14). In chapter 4, entitled "We Agnostics" the theme is unambiguously proselytizing:
"As soon as we admitted the possible existence of a Creative Intelligence, a Spirit of the Universe underlying the totality of things, we began to be possessed of a new sense of power and direction, provided we took other simple steps. We found that God does not make too hard terms with those who seek Him" (id., at 46).
"Instead of regarding ourselves as intelligent agents, spearheads of God's ever advancing Creation, we agnostics and atheists chose to believe that our human intelligence was the last word, the alpha and the omega, the beginning and end of all. Rather vain of us, wasn't it?
"We, who have traveled this dubious path, beg you to lay aside prejudice, even against organized religion. We have learned that whatever the human frailties of various faiths may be, those faiths have given purpose and direction to millions. People of faith have a logical idea of what life is all about" (id., at 49).
A.A.'s Twelve Steps/Twelve Traditions volume, describing the spiritual evolution of atheists and agnostics through working the 12 steps, states:
"Consequently, in Step Three, we turned our will and our lives over to the care of God as we understood Him. For the time being, we who were atheist or agnostic discovered that our own group, or A.A. as a whole, would suffice as a higher power. Beginning with Step Four, we commenced to search out the things in ourselves which had brought us to physical, moral, and spiritual bankruptcy" (A.A. Twelve Steps/Twelve Traditions, at 107).

*683 "So, practicing these Steps, we had a spiritual awakening about which finally there was no question. Looking at those who were only beginning and still doubted themselves, the rest of us were able to see the change setting in. From great numbers of such experiences, we could predict that the doubter who still claimed that he hadn't got the `spiritual angle,' and who still considered his well-loved A.A. group the higher power, would presently love God and call Him by name" (id., at 109 [emphasis supplied]).
The foregoing demonstrates beyond peradventure that doctrinally and as actually practiced in the 12-step methodology, adherence to the A.A. fellowship entails engagement in religious activity and religious proselytization. Followers are urged to accept the existence of God as a Supreme Being, Creator, Father of Light and Spirit of the Universe. In "working" the 12 steps, participants become actively involved in seeking such a God through prayer, confessing wrongs and asking for removal of shortcomings. These expressions and practices constitute, as a matter of law, religious exercise for Establishment Clause purposes, no less than the nondenominational prayer in Engel v Vitale (370 US 421), that is, "a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious" (id., at 424-425 [emphasis supplied]; see also, Lee v Weisman, 505 US 577, 603-604 [Blackmun, J., concurring]).
The ASAT Manual not only fails to disclaim and disassociate the prison system's drug and alcohol addiction treatment program from A.A.'s religious approach to combatting these afflictions, but actually embraces and reinforces worship in the A.A. mold. Thus, the ASAT Manual includes as part of its curriculum, group discussions of "[w]hat it means to work the 12 steps;" exploration of "issues of higher power," with use of a suggested audio entitled "The Will of God;" and prayer and meditation in conjunction with a suggested video entitled "Our Father."
The dissent does not dispute the accuracy of our documentation of the content of A.A. doctrinal texts. Instead, the dissent disavows the significance of the repeated "deistic symbols and allusions" (dissenting opn, at 697) in fundamental A.A. doctrine, that is, to God as a Supreme Being with whom contact through prayer is exhorted, and the like, although, undeniably, the words used "ha[ve] always been religious" (Engel v Vitale, supra, at 424-425). *684 We have purposely quoted at length from the A.A. doctrinal texts to eliminate any doubt but that the references to God and prayer in the Twelve Steps were intended in their "conventional sense" (Welsh v United States, 398 US 333, 352 [Harlan, J., concurring]). That is, the A.A. basic doctrinal writings clearly express a preference for and a conviction favoring a concept of God and prayer which is not merely "`a conscientious social belief, or a sincere devotion to a high moralistic philosophy [but] one based upon an individual's belief in his responsibility to an authority higher and beyond any worldly one'" (id., at 348).[4]
In an effort to downplay the religiosity of the foregoing A.A. tenets, the dissent suggests, without verification from actual source materials, that the unequivocally proselytizing themes of early A.A. texts have implicitly been superseded by later more secular A.A. writings into which A.A. doctrine has evolved, which will become apparent if one would only examine all of the A.A. doctrinal materials in their historical contexts (see, dissenting opn, at 699-700). In this fashion, the dissent discounts entirely, the A.A. Big Book, first written in 1939, instead relying exclusively (id., at 701, 702) on the Twelve Traditions portion of the A.A. Twelve Steps/Twelve Traditions volume published in 1952, particularly because it declares "against sectarian preference" (id., at 701), as though the Establishment Clause only bars State preferences for a particular sect or sects.
The dissent's thesis that there was an historical evolution of A.A. doctrine and therapeutic/rehabilitative methodology from the initial, more religious A.A. Big Book to the later, essentially secular, Twelve Traditions (see, dissenting opn, at 699-700, 702-703), is refuted by the writings themselves. Thus, the 1952 A.A. Twelve Steps/Twelve Traditions volume itself states unequivocally in its Foreword that "[t]he book `Alcoholics Anonymous' [the 1939 A.A. Big Book] became the basic text of the Fellowship, and it still is" (A.A. Twelve Steps/Twelve Traditions, at 17 [emphasis supplied]). The Foreword to the *685 1952 volume also explains the differing roles of the Twelve Steps and the Twelve Traditions. "A.A.'s Twelve Steps are a group of principles, spiritual in nature, which, if practiced as a way of life, can expel the obsession to drink and enable the sufferer to become happily and usefully whole" (A.A. Twelve Steps/Twelve Traditions, at 15 [emphasis supplied]). "[T]he spiritual ideas of the Society were codified for the first time in the Twelve Steps" (id., at 17 [emphasis supplied]).
The Foreword to the A.A. Twelve Steps/Twelve Traditions also articulates the function and origin of the Twelve Traditions, that "[t]hey outline the means by which A.A. maintains its unity and relates itself to the world about it" (id., at 15 [emphasis supplied]). The Twelve Traditions were developed as the A.A. movement began to achieve widespread acceptance, in response to "threatening questions of membership, money, personal relations, public relations, management of groups, clubs, and scores of other perplexities" (id., at 18).
Thus, the 1952 volume, a portion of which the dissent relies upon as demonstrating a basic A.A. doctrinal shift to the secular, itself explains the dichotomy of roles between the A.A. Big Book and Twelve Steps on the one hand, and the Twelve Traditions on the other. The former writings contain A.A.'s spiritual doctrines and therapeutic, rehabilitative modalities, to be "practiced as a way of life" (id., at 15). As we have demonstrated, these texts are unequivocally religious in theme and proselytizing in content.
Conversely, the Twelve Traditions essentially deal with the nondoctrinal, secular problems which can be expected to arise and challenge any popular movement  organizational structure, finances, membership eligibility, management authority and the like. It should come as no surprise, therefore, that the content of the Twelve Traditions is more secular and less religious in tone than its Twelve Steps companion piece in the same volume. That is because it was designed not to supersede the reverent doctrines and practices of the A.A. literature which we have already quoted, but to address the essentially secular issues the A.A. movement confronted as it achieved public acceptance. Even then, the Twelve Traditions portion of A.A. Twelve Steps/Twelve Traditions reaffirms the essential religious convictions of the A.A. society. In the "long form" Twelve Traditions, Tradition Three contains a parable concerning an atheist, "Ed", who, after joining A.A. protested all of the "God stuff" of practicing the Twelve Steps. Then, as expected, Ed lapsed from sobriety, until, alone and "holed up *686 in a cheap hotel * * * [a]s he tossed in bed, his hand brushed the bureau near by, touching a book. Opening the book, he read. It was a Gideon Bible. * * * It was the year 1938. He hasn't had a drink since" (A.A. Twelve Steps/Twelve Traditions, at 143-145). Thus, while it is of course true that the primary objective of A.A. is to enable its adherents to achieve sobriety, its doctrine unmistakably urges that the path to staying sober and to becoming "happily and usefully whole," is by wholeheartedly embracing traditional theistic belief.
Even if the dissent's disavowal of A.A.'s religiosity is found not compelling, the dissenters suggest that the A.A. component of the ASAT Program (1) is essentially insignificant or "attenuated" (see, dissenting opn, at 699), albeit requiring at least weekly attendance at A.A. operated group meetings for 26 weeks and constant working of the Twelve Steps in all other parts of the ASAT curriculum; and (2) is readily severable from the predominantly secular ASAT Program (dissenting opn, at 709), although the ASAT Program Manual itself states that participation in the A.A. group meetings is "essential to the fulfillment of program goals" (emphasis supplied). These alternative arguments are therefore also unpersuasive.

II
Once, thus, it has been demonstrated that A.A. tenets and practices necessarily entail religious exercise, the conclusion appears unavoidable that its use by the State correctional system as an essential component of an exclusive, compulsory attendance ASAT Program violates the Establishment Clause. Here, the State, through its correctional authorities at the Shawangunk Facility, has exercised coercive power to advance religion by denying benefits of eligibility for the Family Reunion Program to atheist and agnostic inmates who object and refuse to participate in religious activity which is an inextricable part of the ASAT Program. No secular drug and alcohol addiction treatment program devoid of A.A.'s practices and doctrines, which would qualify an inmate for eligibility to participate in the Family Reunion Program, is offered as a substitute.

A.
There is no firmer or more settled principle of Establishment Clause jurisprudence than that prohibiting the use of the State's power to force one to profess a religious belief or participate in a religious activity. As Justice Black explained in the *687 first case applying the Establishment Clause to the States, "[t]he `establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. * * * Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs" (Everson v Board of Educ., 330 US 1, 15-16 [emphasis supplied]).
The Court in Torcaso v Watkins (367 US 488) struck a provision of a State Constitution conditioning the right to hold public office on a declaration of belief in God, holding: "[w]e repeat and again reaffirm that neither a State nor the Federal Government can constitutionally force a person `to profess a belief or disbelief in any religion.' Neither can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs" (id., at 495 [emphasis supplied]).[5]
Indeed, in Lee v Weisman (505 US 577, supra), although the Supreme Court split on whether a junior high school's inclusion of a nondenominational prayer at its graduation exercises was coercive, the Court was unanimous in condemning State compulsion to attend or participate in a religious practice. Justice Kennedy, writing for the majority, stated (505 US, at 596): "[i]t is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice." Concurring in Lee v Weisman, Justice Blackmun opined that coerced attendance at a religious exercise is invariably sufficient to establish an Establishment Clause violation (505 US, at 604, supra): "[a]lthough our precedents make clear that proof of government coercion is not necessary to prove an Establishment Clause violation, it is sufficient. Government pressure to participate in a religious activity is an obvious indication that the government is endorsing or *688 promoting religion" (emphasis supplied). And Justice Scalia for the four dissenting Justices agreed that the Establishment Clause bars coercion by "force of law and threat of penalty" (emphasis in the original) to engage in a religious activity, such as requiring a person to "attend church and observe the Sabbath" (505 US, at 640, 641, supra).[6]
Thus, it follows that the Shawangunk Correctional Facility may not constitutionally require petitioner "to forfeit his * * * benefits [eligibility for the Family Reunion Program] as the price of resisting conformance to state-sponsored religious practice" (Lee v Weisman, supra, 505 US, at 596). The enforced attendance at A.A. meetings as part of the ASAT Program violates the Establishment Clause in that "an audience gathered by state power is lent * * * to a religious cause" (Tribe, American Constitutional Law, at 1170 [2d ed] [emphasis supplied]). In that way the Shawangunk Facility has "apparently employed the machinery of the state to gather an [involuntary] audience for religion" (id., at 1173).

B.
Despite the overwhelmingly religious tone of the A.A. basic texts as quoted above, literally urging performance of quite traditional religious devotional exercises in working the 12 steps, and the pressure put on petitioner to attend A.A. sessions at pain of losing family contacts, the Appellate Division apparently accepted respondents' position that the Establishment Clause was not violated because other A.A. writings suggest a toleration of belief in a "God" as merely some "Higher Power" without any religious content (see, 211 AD2d, at 189-190). Therefore, the Appellate Division concluded, the petition fails even at the pleading stage, in the absence of some extrinsic evidence of religious coercive techniques used in actual practice at A.A. meetings in the Shawangunk Facility *689 (211 AD2d, at 194). Aside from the obvious difficulty in conceptualizing how one could perform a confessional of "wrongs" (Step 5) or seek, through "prayer," "contact" (Step 11) with a God devoid of religious content, the Appellate Division's rationale for upholding the A.A. component of the ASAT Program is erroneous in two respects. First, even if respondents are correct that A.A. permits a secular interpretation of its doctrines and practices, undeniably its paramount theme, as we have demonstrated, favors a religious interpretation. Therefore, respondents' defense fails under the "wholesome `neutrality'" requirement of the Establishment Clause (see, Abington School Dist. v Schempp, 374 US 203, 222, supra [emphasis supplied]).
The A.A. volunteers who are invited to conduct the prison self-help group meetings of inmates in the ASAT Program, where the 12 steps are worked, can reasonably be expected to be wholeheartedly imbued with and committed to the religious precepts predominating in the A.A. basic texts. It, therefore, is highly unlikely that the religious indoctrination of A.A. volunteer leaders would not affect the tone and content of A.A. sessions for inmates. Exactly that result was proved at trial before the United States District Court in Warner v Orange County Dept. of Probation (870 F Supp 69 [SD NY]). There, the plaintiff was required to participate in A.A. meetings as a condition of probation upon his State conviction for drunken driving. The United States District Court found that "[g]roup prayer was common at the A.A. meetings plaintiff attended. Many of the meetings began with a non-denominational `Serenity Prayer' * * * and all of the meetings ended with the Lord's Prayer, which is a specifically Christian prayer. In addition, those attending the meetings were strongly encouraged to pray" (id., at 71). In O'Connor v State of California (855 F Supp 303, 306 [D Cal]), virtually identical findings were made on the religiously oriented conduct of A.A. meetings, attendance at which had been imposed as an alternate condition of probation.
Infringement of the neutrality principle underlying the Establishment Clause is readily apparent here. The State, through its ASAT Program, delegates to A.A. volunteers a crucial part of the State's discretionary authority to conduct mandatory treatment programs for alcohol and drug addicted inmates in the State's prison system. Inmates are pressured to participate in the program by the State's conditioning eligibility for the Family Reunion Program on attendance. Yet correctional authorities have not incorporated into the ASAT *690 Program any effective means to insure that A.A. meetings for inmates are free of religious content and that rehabilitation and treatment are performed by purely secular means, rather than the unequivocally proselytizing messages of the A.A. Big Book and A.A. Twelve Steps/Twelve Traditions we have previously quoted.
In the foregoing respects, the State-adopted exclusive but mandatory ASAT Program fails to pass Establishment Clause muster for the same reason that the Supreme Court affirmed this Court's invalidation of the New York statute creating a special school district in Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet (512 US 687, supra). Here, as in Kiryas Joel, the State "departs from [the constitutional command of neutrality] by delegating the State's discretionary authority over [a required rehabilitation program for prison inmate addicts] to a group defined" by its literature and governing precepts as committed to encouraging acceptance of religious doctrine; yet the State "gives no assurance that [such] governmental power has been or will be exercised neutrally" (id., 512 US, at 696).

C.
In apparently concluding that no Establishment Clause violation occurred here because A.A. does not require a participant to adhere to a sectarian belief in God, but permits one to entertain a secular concept of a Higher Power devoid of religious content, the Appellate Division committed a second error by disregarding application of the second prong of the three-part test (the purpose-effect-entanglement test) for primary Establishment Clause analysis articulated in Lemon v Kurtzman (403 US 602, supra). Contrary to the implicit rationale of the Appellate Division, State-coerced adherence to a religious sect is not necessary to prove an Establishment Clause violation under any portion of the Lemon test (id.; see also, Lee v Weisman, supra, 505 US, at 603-604 [Blackmun, J., concurring]). Specifically, under the second prong of the Lemon test, State action is invalid if its "primary effect" is to advance or promote religion (Lemon v Kurtzman, 403 US, at 612, supra).
Since its articulation as the second prong of the Lemon test in Establishment Clause jurisprudence, there have been several important refinements to the "primary effect" test. First, a "primary" effect of advancing religion does not connote that the religious consequences of the State action must predominate over any secular objective or consequence. No measurement *691 or weighing of the respective secular and religious effects is required. "We do not think that such metaphysical judgments are either possible or necessary. Our cases simply do not support the notion that a law found to have a `primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion" (Committee for Pub. Educ. v Nyquist, 413 US 756, 783-784, n 39 [emphasis supplied]). A violation also is established if the State action's "inevitable effect [is] to aid and advance" religion (id., at 793 [emphasis supplied]).
In addition, later decisions construing the second prong of Lemon "have refined the definition of governmental action that unconstitutionally advances religion * * * [by] pay[ing] particularly close attention to whether the challenged governmental practice either has the purpose or effect of `endorsing' religion" (Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 592, supra). That concept "`preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is favored or preferred'" (id., at 593 [quoting Wallace v Jaffree, 472 US 38, 70 (O'Connor, J., concurring)]). The prohibition against governmental endorsement of religion means "at the very least, [that government is barred] from appearing to take a position on questions of religious belief or from `making adherence to a religion relevant in any way to a person's standing in the political community'" (Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US, at 594, supra [quoting Lynch v Donnelly, 465 US 668, 687 (O'Connor, J., concurring)]). An endorsement violating the Establishment Clause can be determined by examining whether the message that the government's practice communicates may be fairly understood as favoring or promoting religion (id., at 595). That is, it must be ascertained whether "the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices" (Grand Rapids School Dist. v Ball, 473 US 373, 390).
Applying the foregoing criteria we conclude that the inclusion of the A.A. 12 steps and other doctrines and meeting practices in a mandated, exclusive drug addiction and alcoholism rehabilitation program at the Shawangunk Correctional Facility constitutes the prohibited endorsement of religion violating the Establishment Clause. It is simply unimaginable that *692 inmates in the inherently authoritarian atmosphere of a prison would not perceive that such a mandatory, exclusive program, facially containing expressions and practices that "ha[ve] always been religious" (Engel v Vitale, 370 US, at 424-425, supra), favors inmates who adhere to those beliefs, and symbolically condones the religious proselytizing those expressions literally reflect (Grand Rapids School Dist. v Ball, 473 US, at 390-391, supra). Indeed, this very perception of the A.A. component of the ASAT Program was what prompted the initial written response of a facility official to petitioner's grievance, stating upon reading the Twelve Steps and Twelve Traditions, that the facility did not offer a "program (therapeutic) without a religious background."
For all the foregoing reasons, a mandatory, exclusive ASAT addiction treatment program at the Shawangunk Correctional Facility incorporating the A.A. Twelve Steps methodology, credo and meeting practices, violates the Establishment Clause.

III
Before concluding this opinion, we find it necessary to respond to some of the dissent's criticisms of our holding. First, the dissent misreads our decision in persistently characterizing it (a) as hostilely "root[ed] in a proposition" that A.A. itself and its religious practices and precepts are constitutionally "objectionable" (dissenting opn, at 699; see also, id., at 700-701, 705-706, 706); and (b) as implicitly holding that the Establishment Clause was violated merely by the "importation" (dissenting opn, at 705), "permeation" (id., at 706), "religious alchemy" and "profound absorption" (id., at 714) of the incorporation of A.A. materials into the ASAT curriculum. The latter interpretation of our holding appears to underlie the dissent's criticism that we have found the ASAT curriculum to be "a dominating form of religious coercion" (dissenting opn, at 708), and the dissent's suggestion that we have empowered petitioner to dictate the content of the ASAT curriculum "`to [his] individual preferences'" (id., at 706). This also appears to account for the dissenters' "puzzle[ment]" (id., at 704) respecting our position that incorporation of A.A. components into a truly voluntary inmate drug rehabilitation program could validly be accomplished.
Neither of these two characterizations of our holding finds even inferential support, let alone express substantiation in the majority writing. To the contrary, we have repeatedly indicated throughout the decision that the decisive factor in our analysis was not the incorporation of A.A. doctrine and *693 practices into the ASAT Program, but the facility's application of coercive pressure to participate in an exclusive inmate drug and alcohol treatment program having that component (see, supra, at 686-688, 689-690, 691, 695-696). Rather than condemning A.A. and its practices we specifically acknowledged A.A.'s "proven effectiveness" (supra, at 677). Our decree specifically prohibits only the coercive aspects of conditioning petitioner's eligibility for the Family Reunion Program on attendance in the ASAT Program as presently constituted.
Second, pointing to the commendable secular purposes and effects of both the ASAT Program and A.A. in the battle against alcohol and drug addiction, the dissent appears to conclude that any religious aspects of the incorporation of mandated A.A. devotional materials and practices are out-weighed by the secular purposes and effects of ASAT and A.A. Thus, the dissenters list as "key" to their vote to affirm their evaluation that the ASAT Program and A.A. remain "over-whelmingly secular" (dissenting opn, at 698 [emphasis supplied]); and repeatedly stress the "predominantly secular" "goal[s]", "aim[s]" and "purpose[s]" of ASAT and A.A. (see, id., at 697, 701, 706, 708-709, 709). The teaching of the Supreme Court decisions, as we have already noted, rejects subjective assessments purporting to quantify the respective religious and secular purposes and effects of governmental action (see, Committee for Pub. Educ. v Nyquist, 413 US 756, 783-784, n 39, supra ["Our cases simply do not support the notion that a law found to have a `primary' effect to promote some legitimate end under the State's police power is immune from further examination to ascertain whether it also has the direct and immediate effect of advancing religion"]).
Alternatively, the dissent argues that we have too rigorously applied the reach of the Establishment Clause (dissenting opn, at 700-701) and, relying upon Justice Brennan's concurring opinion in McDaniel v Paty (435 US 618, 638-639, 641) (dissenting opn, at 705) attempts to bring this case within the rubric of precedents more loosely applying the Establishment Clause when strict enforcement would conflict with the values reflected in the Free Exercise Clause or the Free Speech Clause of the First Amendment.[7] Thus, the dissent gives special emphasis to the portion of Justice Brennan's McDaniel opinion *694 stating that the Establishment Clause may not be used "`as a sword to justify repression of religion or its adherents from any aspect of public life'" (435 US, at 641, supra) (dissenting opn, at 705). These precedents are entirely inapposite to the instant case, or to our ruling in it. Our holding does not interfere with any inmate's free choice to avail him or herself of A.A. religious practices in a prison setting to combat alcohol or drug addiction, or freely to enter into the present ASAT Program. Rather, our ruling identifies as the critically objectionable aspect of respondent's correctional policy here, the application of coercive pressure upon petitioner to attend and participate in a religious exercise at penalty of losing any possibility for cherished, expanded family contacts. Thus, we think more fitting to the issues here are the following excerpts from Justice Brennan's concurrence in McDaniel v Paty:
"Beyond these limited situations in which government may take cognizance of religion for purposes of accommodating our traditions of religious liberty, government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits. * * *
"Fundamental to the conception of religious liberty protected by the Religion Clauses is the idea that religious beliefs are a matter of voluntary choice by individuals and their associations" (McDaniel v Paty, 435 US, at 639-640, supra [Brennan, J., concurring] [emphasis supplied]).
Indeed, where we particularly part company with the dissent is in the respective responses to the coercive aspect of correction facility policy regarding the ASAT Program and inmate/family visitation. As we have already quoted, the core principle of the Establishment Clause is that religious observance must be "a matter of voluntary choice" (id., at 640), and that the State may not "force nor influence a person to go to * * * church against his will or force him to profess a belief" (Everson v Board of Educ., supra, 330 US, at 15-16).
*695 Even those scholars who urge a shift to a more flexible, accommodating approach to Establishment Clause jurisprudence than the present Supreme Court decisions would dictate, recognize the need for retaining the vitality of that principle. Thus, Professor Witte, in the same article relied upon by the dissent (see, dissenting opn, at 705), would continue to condemn accommodations of religion which "effectively coerce public participation in religious exercises such as prayer" (Witte, The Essential Rights and Liberties of Religion in the American Constitutional Experiment, 71 Notre Dame L Rev 371, 428 [emphasis supplied]). Nor would Witte limit the prohibition to school prayer cases, which the dissent suggests are sui generis and totally inapplicable here (dissenting opn, at 713-714). Rather, Witte applies a universal, enduring principle of voluntarism as the central meaning of the Establishment Clause, that to "effectively coerce" a person to attend religious exercises such as prayer violates the Constitution because "[p]arties will choose to participate in the prayer * * * not out of voluntary conviction, but because of the civil and social advantages attached to [it]" (Witte, op. cit., at 428 [emphasis supplied]; see also, Welsh v United States, 398 US 333, 356-357, supra [Harlan, J., concurring]; Torcaso v Watkins, 367 US 488, 495, supra).
The dissent, however, denies that conditioning eligibility for the Family Reunion Program on full attendance and participation in ASAT, including its A.A. component, was coercive, since petitioner "voluntarily chose the course of action that placed his agnosticism" above his desire to achieve extended family contacts and because the facility retained discretion to exclude him from the Family Reunion Program in any event (dissenting opn, at 711). Such a narrow, grudging application of the anticoercive core of the Establishment Clause is inconsistent with the case law, barring even State "influence" to attend a religious exercise (Everson, supra).
Likewise, in Zorach v Clauson (343 US 306)  a case invoked by the dissent (dissenting opn, at 705, 710, 713) for the proposition that petitioner was not coerced by the threat of lost eligibility for the Family Reunion Program  Justice Douglas, in rejecting the Establishment Clause claim, expressly relied upon the total absence of any influence by school authorities on a student's election to take religious instruction:
"The present record indeed tells us that the school authorities are neutral in this regard and do no more than release students whose parents so *696 request. If in fact coercion were used, if it were established that any one or more teachers were using their office to persuade or force students to take the religious instruction, a wholly different case would be presented" (id., at 311 [emphasis supplied]).
The dissent's "voluntary choice" regarding a "discretionary" family visitation program rationalization is identical to the Maryland Court of Appeals' theory for upholding its State Constitution's test oath for eligibility for elective or appointive public office in Torcaso v Watkins (supra), that is, that the petitioner was not under "`compulsion [to believe in God because] * * * he is not compelled to hold [public] office.'" (367 US, at 495.) The Supreme Court rejected that rationale, holding that, while a person may neither be compelled to hold nor have an abstract right to public office, that "cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution" (id., at 495-496).
Nor is the dissent's position consistent with the constitutional history of the Establishment Clause, which demonstrates an intention to protect religious voluntarism against even subtle governmental pressure. Thus, Justice Brennan in Abington School Dist. (supra), in interpreting the clause as a mandate to leave religious matters completely to the free conscience of the citizen, quoted the following from the congressional debates on the Bill of Rights: "`the rights of conscience are, in their nature, of peculiar delicacy, and will little bear the gentlest touch of governmental hand'" (374 US, at 231 [quoting Representative Daniel Carroll of Maryland during the debate upon the proposed Bill of Rights in the First Congress, August 15, 1789, I Annals of Cong 730] [emphasis supplied]).
Indubitably, the State through its Shawangunk Correctional Facility officials have applied far more than the "gentlest touch" to make petitioner violate his personal conscience by depriving him of opportunities for increased family visits because he refused to attend and participate in A.A. activities heavily imbued with religious content. Therefore, the State's requirement that petitioner fully participate in the present ASAT Program in order to qualify for the Family Reunion Program violates the Establishment Clause and cannot be permitted to stand.
Accordingly, the order of the Appellate Division should be reversed, without costs, and judgment granted in favor of *697 petitioner prohibiting respondents from conditioning petitioner's participation in the Family Reunion Program on attendance in the subject Alcohol and Substance Abuse Treatment Program, as presently constituted.
BELLACOSA, J. (dissenting).
Judge Ciparick and I would affirm the lower courts' rejection of petitioner's lawsuit. The majority centers its reversal and grant of relief in this case on coercion. That must, however, be coupled with a finding that the Alcohol and Substance Abuse Treatment (ASAT) Program of the New York State Department of Correctional Services fosters a religious practice in the first place. The building blocks rest also on the attribution to the ASAT Program of "religious-oriented practices and precepts" (majority opn, at 677 et seq.) called together from the Alcoholics Anonymous (A.A.) Twelve Step paradigm. The combination, tied together by a tenuous application of a coercion concept, produces a declaration that the Establishment of Religion Clause of the United States Constitution has been violated (US Const 1st Amend).
We conclude that the allegedly compelled religious root  the deistic symbols and allusions selected principally from A.A. literature concerning its Twelve Step Program  does not justify the judicial relief that ultimately excuses petitioner-appellant inmate on First Amendment grounds from the benefits of the ASAT Program, when he wishes to avail himself of the Correctional Services Department's Family Reunion (expanded visitation) Program. The key premises of our votes to affirm include:
 The ASAT Program and this case, analyzed within the three-pronged criteria of Establishment Clause review (see, Lemon v Kurtzman, 403 US 602) and recent, relevant authorities, do not breach constitutional boundaries;
 The ASAT Program is inappropriately analogized to uniquely sensitive public school settings under First Amendment jurisprudence;
 The ASAT Program is a rationally justified and voluntary means of serving the important and predominantly secular State goal of treating and reducing inmate substance abuse;
 The ASAT Program, to the extent that it incorporates suggested aspects of the A.A. Twelve Step Program that some may perceive as somewhat religious, remains overwhelmingly secular in philosophy, objective and operation;

*698  Petitioner-appellant's challenge and proffered record lack the quality and quantum necessary to justify this first impression holding.

I.
ASAT is the primary umbrella program operated by the New York State Department of Correctional Services to provide treatment options for chemically dependent inmates. Not all of the substance abuse programs offered by the Department are considered to be ASAT Programs; only those operated or overseen by ASAT staff and complying with program standards are treated as such. According to the ASAT Program Operations Manual, the primary mission of ASAT is "[t]o prepare chemically dependent inmates for return to the community and to reduce recidivism * * * by providing education and counseling focused on continued abstinence from all mood altering substances and participation in self-help groups based on the `Twelve Step' approach." The ASAT philosophy declares that it uses the "12-Step approach to recovery" and that "[b]y working the 12 suggested steps" a person achieves "a realistic understanding of himself/herself" (emphasis added). It continues: "The 12 steps of A.A. act as a guide which provide the tools to build a new way of life without the use of alcohol and/or drugs, one day at a time" to prevent relapses upon release (emphasis added).
The services offered through ASAT involve three main components. First, treatment, education and family counseling services are formally part of the ASAT Program. Second, participants are urged to use other academic, vocational, and social or medical services made available to them although not part of the formal ASAT Program. Third, enrollees are required to participate in independent, volunteer-led self-help groups. The self-help group component provides the sole and slender nexus for the controversy here and the declaration of unconstitutionality. In that respect, the ASAT Program Manual states that "[i]t should be noted that self-help groups such as A.A. and N.A. are not part of the formal ASAT Program but are an important adjunct to it. The groups must be separated from the ASAT Program and not supervised or chaired by ASAT staff. Affiliation and employee involvement is counter to self-help group traditions" (emphasis added).
*699 The basic ASAT treatment method encompasses approximately 330 hours of counseling and therapy spread over a 26-week period. This includes mostly lectures, seminars, group discussions, and counseling focused on addiction and recovery. Self-help group participation is not a predominant part and, indeed, constitutes an attenuated feature of the total ASAT experience, consisting of only 26 hours of the total program period. The ASAT Program, rather than commanding some doctrinal hegemony, is thus notable for its diversity, variety, voluntariness and nuanced interplay of various components.
The center of gravity for the resolution of this lawsuit is a finding that the ASAT Program unconstitutionally compels petitioner to join in religious practices as a condition to his receiving the discretionary benefit of the Correctional Services Department's extra visitation program. The ASAT Program is thus charged with imposing a State endorsement of and entanglement with practices of A.A. deemed religiously intrusive and objectionable. The analysis expressly refers to deistic expressions from A.A.'s Twelve Step modality. Our interpretation of this integral dispositive rationale specifically and fairly identifies its root in a proposition that A.A. advances "religious-oriented practices and precepts" that urge "performance of quite traditional religious devotional exercises" (majority opn, at 677, 688).
A brief overview of A.A. history and its operating principles contradicts the predicate assumptions that drive petitioner's tenuous theory. A.A. was founded in 1935 as a general concept under which community groups of independent individuals voluntarily join together in common experience and discipline to try to stay sober. The two basic texts of A.A. are Alcoholics Anonymous (Alcoholics Anonymous World Services, Inc. [3d ed 1976] ["the Big Book, The Basic Text for Alcoholics Anonymous"]) and Twelve Steps and Twelve Traditions (Alcoholics Anonymous World Services, Inc. [3d ed 1981]), which were originally published in 1939 and 1952, respectively. Substantially, if not overwhelmingly, they reflect suggested secular and spiritual guideposts, not compulsory religious commandments or tenets of some New-Age or even Old-Time religion.
As the Preface to the "Big Book" states, "[b]ecause this book has become the basic text for our Society and has helped such large numbers of alcoholic men and women to recovery, there exists a sentiment against any radical changes being made in it. Therefore, the first portion of this volume, describing the A.A. recovery program, has been left untouched in the course *700 of revisions made for both the second and the third editions." A.A. has thus refrained from revising its founding texts to conform to politically correct themes and times or to excise expressions objectionable to the school of "secular individualism" (Dent, Book Review, 46 J Legal Educ 130, 131-134 [1996]).
The United States Supreme Court has itself observed that in considering the principles underlying the Establishment Clause, there may be a "`tendency of a principle to expand itself to the limit of its logic'; such expansion must always be contained by the historical frame of reference of the principle's purpose, and there is no lack of vigilance on this score by those who fear religious entanglement in government" (Walz v Tax Commn., 397 US 664, 678-679, quoting Cardozo, The Nature of the Judicial Process, reprinted in Selected Writings of Benjamin Nathan Cardozo, at 127 [Hall ed 1947]). Thus, "the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. We have refused `to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history' [emphasis in original]. * * * In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court" (Lynch v Donnelly, 465 US 668, 678 [emphasis added]; see also, Walz v Tax Commn., 397 US 664, 671, supra; 4 Rotunda and Nowak, Constitutional Law  Substance and Procedure § 21.3, at 459 [2d ed 1992]; Kurland, Religion and the Law of Church and State and the Supreme Court, at 111 [1962]).
Rigidity is eschewed because "[f]ocus[ing] exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause" (Lynch v Donnelly, 465 US 668, 680, supra). The Supreme Court has thus stated that "our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action" (Lynch v Donnelly, supra, at 683). The Court has made it abundantly clear, however, that "`not every law that confers an "indirect," "remote," or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid'" (Lynch v Donnelly, supra, at 683, quoting Committee for Pub. Educ. v Nyquist, 413 US 756, 771). We are satisfied that perceived religious aspects of A.A. transmuted into ASAT are indirect, remote and incidental, and neither compulsory nor mandatory (see, Lynch v Donnelly, supra). Yet, the majority *701 rules that the United States Constitution and Supreme Court precedents demand a virtually pure secularity (majority opn, at 677, 686, 690). In any event, coercion alone cannot transform such incidentalism into an Establishment Clause violation. There is no theory, case or authority that we know of for a theory with that kind of trumping quality (see generally, Glendon, Law, Communities, and the Religious Freedom Language of the Constitution, 60 Geo Wash L Rev 672, 679 [1992]; see also, Gedicks, The Rhetoric of Church and State, at 63-65, 72, 82, 120-121 [1995]).
When A.A.'s Twelve Steps are drawn across the Establishment Clause divide, a challenger must bear a very high burden of demonstrating unconstitutionality beyond a reasonable doubt. The objectant must present more than superficial analysis of the operating principles of the challenged State exertion.
A fair review of the totality of the A.A. message and mission reasonably supports our acceptance of its published and principled representation that its renowned singular aim is simply to help people help themselves in attaining and maintaining sobriety  a salutary public objective pursued through personal, voluntary and secular means. Empirical data makes this goal an especially demonstrable imperative for a rehabilitative correctional facility population. Our examination of the deistic references and semantical icons from the A.A. Twelve Steps discloses a concededly spiritually accented landscape, but not a constitutionally objectionable religious core.
The A.A. Traditions helpfully illustrate the primary and principal effect of the ASAT Program. Tradition Six states, "An A.A. group ought never endorse, finance, or lend the A.A. name to any related facility or outside enterprise, lest problems of money, property, and prestige divert us from our primary purpose." The "Long Form" of Tradition Ten continues this theme, stating: "No A.A. group or member should ever, in such a way as to implicate A.A., express any opinion on outside controversial issues  particularly those of politics, alcohol reform, or sectarian religion. The Alcoholics Anonymous groups oppose no one. Concerning such matters they can express no views whatever" (emphasis added). These explicit declarations against sectarian preference or promotion are disdained as irrelevancies in the majority's dispositional analysis (majority opn, at 681, 687, n 5) and turned into a distortion of our dissenting viewpoint (majority opn, at 684).
*702 Notably, too, the reliance upon speculative assertions of some prison staff that ASAT might harbor some religious features based on their personal reading of some of the literature is misplaced and does not materially aid in the resolution of this case. Unfounded, ambiguous and unofficial conclusions provide no basis for arriving at definitive findings regarding State action, with the dispositional and precedential consequences of this ruling.

II.
Our differences, however, must stay focused on the Establishment Clause and the constitutional issue, not on the whole or even selected excerpts of the A.A. message and literature, or A.A. projected into ASAT through A.A.'s original, historical, evolving or modern visage or operational reality. The Supreme Court has stated that "a determination of what is a `religious' belief or practice" under the Constitution "may present a most delicate question," but that if the belief turned on the "subjective evaluation and rejection of the contemporary secular values," such beliefs would not rest on a religious basis because the choice made by the individual would then be "philosophical and personal rather than religious" (Wisconsin v Yoder, 406 US 205, 215-216; see also, Tribe, American Constitutional Law § 14-6, at 1183 [2d ed 1988]).
A.A. principles unquestionably arise from a secular philosophy and psychology, which espouse a fellowship of different individuals sharing their experiences in a confidential and voluntary manner that can mutually reinforce the individual desire and effort to overcome a terrible addiction and propensity more readily than if people tried to survive and conquer the disabling disease alone. The transcendent, human, spiritual qualities of this commitment and endeavor do not thrust the experience into a religious realm. Nor does the recognition and acceptance of some "Higher Power," outside of the "Ego," constitutionally connote a theistic ontology (see, Glendon, op. cit., at 679).
Professor Stephen Carter has noted that the religious characterization with which A.A. is sometimes cloaked does not come from its throngs of participants and beneficiaries, and that constitutional hostility to religion may be lessening (see, Carter, The Culture of Disbelief, at 121, n, and in context at 120-123 [1993]; Carter, The Resurrection of Religious Freedom?, 107 Harv L Rev 118, 119, 130-132, 142; see also, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573; *703 Abington School Dist. v Schempp, 374 US 203, 205; Gedicks, Public Life and Hostility to Religion, 78 Va L Rev 671; Gedicks, The Rhetoric of Church and State [1995]). Professor Philip Kurland, in a seminal work, urged "neutral principles" of adjudication in such controversies and offered these insights:
"[T]he wisdom of the framers of the first amendment [is] in their objectives of keeping the church free from domination by government and the state free from alliance with religion. * * * The freedom and separation clauses should be read as stating a single precept: that government cannot utilize religion as a standard for action or inaction because these clauses, read together as they should be, prohibit classification in terms of religion either to confer a benefit or to impose a burden. This test is meant to provide a starting point for the solution to problems brought before the Court, not a mechanical answer to them" (Kurland, op. cit., at 111-112 [emphasis added]).
Despite the competition of vocabulary and classifications between secularism versus communitarianism and neutrality versus accommodation, no one should lose sight of the relevant analytic framework and fact that this petitioner's entire claim is predicated on the Establishment of Religion Clause. He makes no complaint whatsoever of restriction of his freedom to exercise religion or nonreligion. Yet, the majority's vital building block is a coercion element, applied in a novel fashion as a matter of law that echoes between the twin chords of the First Amendment's religion clauses. This is far beyond the coerced formal prayer in a school setting in Lee v Weisman (505 US 577) relied on so heavily by the majority (majority opn, at 688, n 6; contrast, Zorach v Clauson, 343 US 306).
We join, nevertheless, in the majority's hope for no broader precedential and practical sweep than necessary, and that public officials will continue to recognize and utilize valuable treatment modalities offered through instrumentalities like ASAT and A.A. At the same time, we remain legitimately concerned about how they do so in light of the reasoning that leads to the precise holding. For example, if purely voluntary, unconditional participation in an ASAT-A.A. Program satisfies all the Lemon prongs and, thus, would not constitute an Establishment Clause violation in that universe and fact pattern, how *704 and why does the addition of a dominant coercion element transcend and neutralize the satisfaction of the core criteria on establishment grounds? Stated conversely, if coercion of the distinctive kind asserted here is not present, how and why, then, would the same ASAT-A.A. Program, in a purely voluntary regimen, escape the Establishment Clause cloud engendered by the whole of the rationale of this case? The answers to these troublesome queries, for us at least, are elusive, unpersuasive and puzzling.

III.
The Establishment Clause in 10 words declares that "Congress shall make no law respecting an establishment of religion" and is applicable to the States through the Fourteenth Amendment (US Const 1st, 14th Amends; Abington School Dist. v Schempp, 374 US 203, 205, supra). The Supreme Court realistically recognizes that total separation of Religion and State in a pluralistic society with this Nation's history and traditions is not possible or even desirable.
Towards the preservation and recognition of renowned laudatory ends and multifaceted protections, the Supreme Court has stood by a test to determine whether particular government endorsements or entanglements with religion are prohibited by analyzing "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority" (Lemon v Kurtzman, 403 US 602, 615, supra). In Lemon, the Supreme Court declared the well-known tripartite test: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion * * *; finally, the statute must not foster `an excessive governmental entanglement with religion'" (id., at 612-613 [citations omitted]).
Individual Justices of the Supreme Court have expressed varying qualms about the continued usefulness and viability of Lemon (see, Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 655, supra [Kennedy, J., concurring in part and dissenting in part]; Edwards v Aguillard, 482 US 578, 636-640 [Scalia, J., dissenting]; Lynch v Donnelly, 465 US 668, 688-689, supra [O'Connor, J., concurring]). The evident unevenness generated by the Lemon approach, as reflected in the Supreme Court's latest cases, may be rectified someday and, in its place, a less separationist and more communitarian *705 and beneficial approach may emerge (see especially, Witte, The Essential Rights and Liberties of Religion in the American Constitutional Experiment, 71 Notre Dame L Rev 371, 425-430 [1996]; see, e.g., Rosenberger v Rectors & Visitors of Univ. of Va., 515 US ___, ___, 115 S Ct 2510, 2522-2523; Capitol Sq. Review v Pinette, 515 US ___, 115 S Ct 2440; Bowen v Kendrick, 487 US 589). The Supreme Court, however, has for the most part held onto the Lemon set of guideposts for Establishment Clause jurisprudence, analysis and application (see, Lamb's Chapel v Center Moriches Union Free School Dist., 508 US 384, 395, n 7).
The majority's overriding emphasis on a coercion prong, however, is disconcerting, especially when applied in this dispositional setting (majority opn, at 680, 686; compare, Zorach v Clauson, 343 US 306, 311-312, supra; Grumet v Board of Educ., 81 N.Y.2d 518, 527, affd 512 US 687; New York State School Bds. Assn. v Sobol, 79 N.Y.2d 333, 339; Matter of Klein [Hartnett], 78 N.Y.2d 662, 666; see also, Witte, op. cit., at 426-427). Indeed, the primary-and-principal-effects prong of Lemon seems to be altered and diluted in a way that may jeopardize other State actions under Lemon (majority opn, at 677, 686; Gedicks, The Rhetoric of Church and State, at 72-73).
All experts, scholars and commentary aside, in any event, the First Amendment and the Supreme Court cases dominate. Petitioner's core claim thus ought to be meticulously examined to see how it measures up against the existing array of authorities  not petitioner's theoretical construct. His complaint centrally relies upon the importation into the ASAT Program of assertedly objectionable religious symbols from the A.A. Twelve Step method. That is his lawsuit, not our characterization of it.
Notwithstanding the majority's objections to our dissenting viewpoint that analyzes the case as it comes to us, coercion  without a linked religious nucleus that emerges as constitutionally offensive  cannot alone justify the reversal in this case. After all, everything this appellant-petitioner prisoner does or does not do is largely governed by the innately coercive atmosphere of his incarceration. He is in a correctional facility. He should not be allowed in the circumstances of this case to wield the Establishment Clause "as a sword to justify repression of religion or its adherents from any aspect of public life" (McDaniel v Paty, 435 US 618, 641; see generally, Carter, The Culture of Disbelief, op. cit.). Yet, petitioner is allowed to do just that when he asserts, and the majority agrees, that the Twelve Steps of A.A. unconstitutionally compel him to participate *706 in a collection of content-based, "religious-oriented practices and precepts," that by permeation into ASAT are together deemed to violate Lemon, solely because he wishes and chooses to apply for privileges permitted under a discretionary expanded visitation regulation.
Petitioner, it should be noted, concedes that ASAT's overriding purpose to treat and reduce substance abuse among prison inmates is secular and, therefore, satisfies Lemon's first criterion (see, Boyd v Coughlin, 914 F Supp 828, 832 [ND NY 1996]). Thus, petitioner's claim, taken in the terms of his own argument, rises or falls under Lemon's second and third criteria, that is, whether ASAT, through A.A., principally or primarily advances religion or impermissibly entangles government with religion.
Whether the primary effect of a governmental policy advances or inhibits religion, in turn, depends on whether the "challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices" (Grand Rapids School Dist. v Ball, 473 US 373, 390). Mere exposure to religious ideas or pure personal subjectivity do not breach the constitutional "blurred, indistinct, and variable barrier" (Lemon v Kurtzman, 403 US 602, 614, supra), nor do individuals possess constitutional rights and power to force government "to tailor public school programs [or the ASAT curriculum, we would respectfully submit] to individual preferences, including religious [or nonreligious] preferences" (see, Ware v Valley Stream High School Dist., 75 N.Y.2d 114, 125). This is precisely what petitioner succeeds in doing by this case. Indeed, not "every state action impacting religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation" (Lee v Weisman, 505 US 577, 597, supra [emphasis added]).
The only references in the ASAT materials to the actual text of the A.A. Twelve Steps  which we believe do not constitute an unconstitutional State-compelled participation in religious practices  are found in Attachment E to the Operations Manual, entitled "ASAT Program Curriculum." The implementation and underlying focus of the counseling provided pursuant to these steps, however, is functionally and decidedly nonreligious (so far as we know on this record), no matter what the incorporated deistic references semantically purport to invoke, suggest and portray.
*707 The petitioner objects particularly to the incorporation by reference of A.A. Steps Three, Five, Six, Seven, Eleven and Twelve into the ASAT curriculum, claiming that parts of their text foster or force a theistic point of view upon his agnostic beliefs. Though the majority agrees with petitioner's argument, we disagree; finer line-drawing is the more progressive and enlightened trend and task (see, Rosenberger v Rectors & Visitors of Univ. of Va., 515 US ___, ___, 115 S Ct 2510, 2526, supra [O'Connor, J., concurring]). Thus, petitioner's claims are not supportable in this case and should not be remediable by the constitutionally rooted relief granted here.
The ASAT curriculum states that the goal of Step Three is "[t]o explore the concepts and barriers in accepting a power beyond self" as well as "[e]xploration of self-centeredness," and that the group counseling focus is to "explore issues of fear (feelings) and its relationship to chemical use." Although the list of suggested discussion topics includes "barriers to faith" and "prayer and meditation," no documentation by the party bearing the heavy burden of proof in such a case is presented that these are anything more than talking points and topics. It cannot be overlooked that, in this group setting, counselors must be prepared to handle inquiries from and concerns of all members of the group, religious and nonreligious alike, and that inhibiting individual inmates from expressing personal views in a secular program may impinge upon their free exercise, free speech and free association rights (see, Rosenberger v Rectors & Visitors of Univ. of Va., supra, 515 US, at ___, ___, ___, 115 S Ct, at 2513, 2520, 2523; Capitol Sq. Review v Pinette, 515 US ___, ___, 115 S Ct 2440, 2448-2449, supra). In a diverse and pluralistic universe, including a prison environment, a curriculum's identification of faith and neutrally described feelings of hope, fear, and trust do not dissipate or override the significantly secular quality within the over-all treatment regimen. Nor do they project religiosity. Moreover, spirituality is not synonymous with religion generally or constitutionally, no matter what Webster's dictionary may acontextually assemble as a general definition (majority opn, at 681).
Steps Eleven and Twelve focus on discussions of the effect of addiction on others and continue to maintain a sense of momentum towards the freedom from dependency developed with the help of the program and its participants. Step Eleven does refer to "prayer and meditation" and "contact with God," but then identifies the goal as: "[A]ssist[ing] in understanding the relationship between disease and its effects on the next *708 generation" and "viewing parenting in terms of recovery behavior." Step Twelve refers to a "spiritual awakening," but rather than having any formalized religious significance or content, the goal of this step is a "[p]ersonal exploration of the feelings related to leaving treatment (and prison)." ASAT is, thus, thoroughly free of religious organization, theses, ritual or doctrine, as expressly ordained by its curriculum. The group discussions are cued to family and recovery issues in a therapeutic and nonreligious manner. The talking points accompanying these A.A. Steps do not implicate religious proselytization or preference, except by petitioner's ingenuously subjective attenuation in this case  and that does not rise to the level of a constitutionally coerced religious entrapment of this petitioner.
In sum, the majority finds that the ASAT "curriculum" suffers from a dominating form of religious coercion and, thus, declares it constitutionally encumbered, sufficiently to justify the final decree of this case. The curriculum focuses principally on assisting inmates on their voyages of self-discovery away from addiction to self-awareness and recovery, and the personal, psychological, social and spiritual means to maintain that state of sobriety or avoidance of dependency once outside the prison walls. Yet, the evidence submitted by petitioner to the courts below to support the constitutional nullification consists principally of the A.A. Twelve Steps sheet distributed as a "suggested handout" to ASAT participating inmates in an attempt to explain non-ASAT self-help group dynamics. Thus, the inordinate constitutional inflation of A.A. texts, pamphlets and personal parables to superimpose an assertedly compulsory religious exertion onto petitioner's participation in ASAT (the only Program at issue in this lawsuit, in which A.A. is not even a party) is seriously flawed because it is not documented by a customary and requisite as-applied record basis.
Persuasively, other courts have concluded that A.A. practices are not constitutionally religious, although they may partake of a blend of secular and spiritual qualities (see, O'Connor v State of California, 855 F Supp 303; Stafford v Harrison, 766 F Supp 1014, 1016; Feasel v Willis, 904 F Supp 582, 586). The District Court in O'Connor found that it was "undisputed that the primary purpose of requiring attendance at self-help meetings such as A.A. is to prevent drunk driving and the tragic injuries and deaths that result from it, while at the same time providing treatment for individuals with substance abuse problems. The `principal and primary effect' of *709 encouraging participation in AA is not to advance religious belief but to treat substance abuse" (O'Connor v State of California, supra, at 307 [emphasis added]).
Similar reasoning was employed in the recent decision of Boyd v Coughlin (914 F Supp 828 [ND NY 1996], supra), which dismissed an inmate's complaint alleging that the ASAT Program violated both the establishment and free exercise components of the Religious Clause. The court noted that "the expressly stated principal and primary goal of the [ASAT] program is the preparation of chemically dependent inmates for return to the community and to reduce recidivism" (id., at 833). In dismissing the plaintiff's claim, the court "determine[d] that there is no material question of fact as to whether the principal and primary purpose of [ASAT] program is to promote or inhibit religion" (id., at 833).
Petitioner and the majority instead misdirect Warner v Orange County Dept. of Probation (870 F Supp 69). In examining that plaintiff's Establishment Clause claim, the District Court stated that its inquiry was limited to "whether the A.A. program as plaintiff experienced it was essentially religious in nature" (id., at 70 [emphasis added]). It found that the plaintiff had established that "[g]roup prayer was common at the A.A. meetings plaintiff attended" and that "those attending the meetings were strongly encouraged to pray," and therefore concluded that "the A.A. program that plaintiff experienced placed a heavy emphasis on spirituality and prayer, in both conception and in practice" (id., at 71 [emphasis added]). In finding that the A.A. program as applied in that case had a direct religious essence and particularized experience, the District Court limited its ruling, stating, "the testimony and evidence in this case support the finding that the A.A. meetings plaintiff attended were the functional equivalent of religious exercise" (id., at 72 [emphasis added]). Additionally, Warner expressly declined to apply the Lemon test (id., at 73, n 2). Thus, it is of no value because it avoided the Lemon test and was decided on the unique as-applied facts evidenced in a Federal trial court.
When a "program or regulation has a sufficiently secular effect" and the "secular impact is sufficiently separable" from any conceivable religious impact, no Establishment Clause violation is presented (see, Tribe, op. cit., § 14-10, at 1216). In this case, petitioner has failed even minimally to demonstrate that the primary and principal purpose of the ASAT Program is to compel advancement of constitutionally implicated religious practices or to stifle agnostic or atheistic preferences.

*710 IV.
Petitioner also argues, and the majority accepts, that the petitioner is "compelled" to attend the ASAT Program, and that this by itself shows that the primary purpose and effect of ASAT becomes one of advancement of religious practices that violates Establishment of Religion strictures. This argument and analysis are factually and legally incorrect and inapplicable to this case. First, coercion is not an abstraction and must be particularized. Second, the ASAT Program is initially voluntary and intrinsically discretionary.
This situation is not at all appropriately analogized to school prayer settings (see, infra, part V.). The Supreme Court has stated that "while proof of coercion might provide a basis for a claim under the Free Exercise Clause, it [is] not a necessary element of any claim under the Establishment Clause" (Committee for Pub. Educ. v Nyquist, 413 US 756, 786, supra; see also, Abington School Dist. v Schempp, 374 US 203, 223, supra; Allegheny County v Greater Pittsburgh Am. Civ. Liberties Union, 492 US 573, 597, n 47, supra; Engel v Vitale, 370 US 421, 430; compare, Zorach v Clauson, 343 US 306, 311-312, supra). Indeed, the special circumstances of prison settings prompted the Supreme Court to hold and pointedly observe:
"`Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' Price v. Johnston, 334 U.S. 266, 285 (1948). The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives  including deterrence of crime, rehabilitation of prisoners, and institutional security [citations omitted]. * * * `[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.' Turner v. Safley, ante, at 89. This approach ensures the ability of corrections officials `to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' ibid., and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to `resolution by decree'" (O'Lone v Estate of Shabazz, 482 US 342, 348-350 [emphasis added]).
*711 Petitioner admitted in his original grievance (before a lawsuit and this appeal ensued) that he was not "being forced to attend the [ASAT] program, but my attendance is required if I intend to continue participation in the FRP program." Thus, the institutional and constitutional compulsion of which petitioner now complains must be considered within the qualifying criteria for the discretionary expanded visitation program. This crucial constitutional distinction  the prisoner has an initial choice whether to participate at all in the extended visitation program and the prison officials correspondingly have wide discretion to regulate the participants  is disregarded in the resolution of this key aspect of this appeal.
The Family Reunion Program grants some inmates the opportunity to receive selected visitors for extended time periods (7 NYCRR 220.1). Eligibility is dependent on satisfying specified criteria, including a minimum length of stay at a correctional facility and a clean disciplinary record (7 NYCRR 220.2 [a], [b]). A relevant feature in this case is attendance by inmates at therapeutic treatment programs related to their particular offenses or over-all histories (7 NYCRR 220.2 [a] [3] [ii]). Because of appellant's admitted heroin use, correctional authorities properly invoked this regulation to require his participation in ASAT for treatment of his addiction (see, 7 NYCRR 220.2 [a] [3] [ii]; 220.8).
Appellant's claim that this requirement legally converts his attendance and participation in the ASAT Program into a compulsory religious exercise, with Establishment Clause implications and consequences, does not withstand scrutiny. He voluntarily chose the course of action that placed his agnosticism and nonbeliefs at risk because he wished to receive something he is not unqualifiedly entitled to from the State. Yet, he wins this lawsuit and the State is charged with compromising his First Amendment Establishment Clause rights.
In Matter of Doe v Coughlin (71 N.Y.2d 48), this Court stated that:
"Given the present regulatory scheme of the Family Reunion Program, [inmates] could have no legitimate expectation that they would be afforded [visits]. * * * Although the regulations establish guidelines, the guidelines do not create an entitlement of [visits] because the review system is heavily discretionary and holds out no more than the possibility *712 of [visits] * * *. Moreover, even though an inmate has previously been approved and participated in the program, there can be no legitimate expectation of continued participation because the regulations provide that inmates must reapply each time they seek a visit, and each application is subjected to a new discretionary review" (id., at 55-56 [emphasis added]).
This significant precedent from this Court bearing directly on the part of the analysis that the majority self-describes as the dispositive feature of its rationale  coercion  is left entirely unanswered and substantially deflected.
Contrary to petitioner's present coercion claim, he suffers no subjugation to unconstitutionally offensive religious practices or influences, even if ASAT and A.A. were deemed to harbor proscribed religious attributes in some constitutionally cognizable sense. The correctional officials exercised appropriate regulatory authority over petitioner's participation in a discretionary visitation program, so long as he also availed himself of a therapeutic program to treat his undeniable substance abuse history that might then earn him the privilege of such extra visitations. This is an appropriate, not "narrow" or "grudging" limitation on petitioner's expectations and entitlements, because the privilege of special visitations is necessarily circumscribed by the threshold circumstance of his incarceration, the nature of the visitation program and the individualized discretionary assessment (majority opn, at 695; see, Matter of Doe v Coughlin, 71 NY2d, supra, at 58; see also, Matter of Rivera v Smith, 63 N.Y.2d 501, 510; O'Lone v Estate of Shabazz, 482 US 342, 348, supra).
A keen parallel for this aspect of the case may be drawn from Hamilton v Regents (293 US 245). The Supreme Court found no privileges and immunities or due process violations predicated on plaintiffs' objection on religious and conscientious grounds to a California statute requiring enrollment and completion of a military science and tactics course as a condition to attending the State's university. Justice Cardozo aptly added his "extra word" to the Court's holding in his inimitable voice:
"Manifestly a different doctrine would carry us to lengths that have never yet been dreamed of. * * * The right of private judgment has never yet been so exalted above the powers and the compulsion of the *713 agencies of government. One who is a martyr to a principle  which may turn out in the end to be a delusion or an error  does not prove by his martyrdom that he has kept within the law" (id., at 268 [Cardozo, J., concurring] [emphasis added]).

V.
Petitioner also presses that the ASAT Program violates the Establishment Clause in that it is similar to requiring public school students to participate in mandatory prayer. This argument, expressly endorsed by the majority, should be flatly rejected. Initially, it must be noted that the petitioner has never claimed that he was required or even urged as part of the ASAT Program to pray or even privately meditate in some religious mode. Thus, at the outset, the ASAT Program can by no stretch of the argumentative method be analogized to the sectarian prayer setting and activity which the Supreme Court condemned as a "state-sponsored religious exercise" in Lee v Weisman (505 US 577, 592, supra) and Engel v Vitale (370 US 421, 424, supra). The majority's transference of these two cases concerning formal prayer in public school settings into this case is particularly unpersuasive.
This should be contrasted to Zorach v Clauson (343 US 306, supra), for example, where New York's released time program was upheld. It allowed pupils to leave their public schools during school hours, but only on condition and for compulsory attendance at religious instruction. The opinion of the Court repelled the Establishment Clause challenge and explicitly rejected the argued "coercion" element as irrelevant. Its analysis is even more pertinent to this case, because neither formal public school prayer nor public financial aid to secular religious schools is implicated here. Those features make the instant case exceptionally different from the authorities so intensely relied on by the majority.
The Supreme Court has stated that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools. * * * Our decisions * * * recognize, among other things, that prayer exercises in public schools carry a particular risk of indirect coercion. The concern may not be limited to the context of schools, but it is most pronounced there" (Lee v Weisman, supra, at 592 [citations omitted]). In Lee, the Court even drew the ironically apt distinction between imposing religion on children and the choices open to adults, adding *714 that it did "not address whether [the] choice is acceptable if the affected citizens are mature adults, but we think the State may not, consistent with the Establishment Clause, place primary and secondary school children in this position" (id., at 593).
The reasoning that likens a prison environment to a school's "inherently authoritarian atmosphere" and prisoners to pupils is wrong. Fundamentally, among other considerations, this ignores the maxim that heightened constitutional analysis governs the protected enclave of students in schools, in contradistinction to the differentiated constitutional protections preserved for mature adults in prisons (see, O'Lone v Estate of Shabazz, 482 US 342, 349, supra; see also, Pell v Procunier, 417 US 817).
The ASAT Program finally suffers no excessive entanglement between State and religion under Lemon's third prong. The assertion of a "delegat[ion of] the State's discretionary authority" (majority opn, at 690) is factually unsupportable on this record. Also, Board of Educ. of Kiryas Joel Vil. School Dist. v Grumet (512 US 687, supra) is totally inapposite in that regard. Here, the State has by no means authorized some religious sect or its functionaries to carry out a public function. Indeed, the majority's expectation that A.A. volunteers working in the ASAT Program will "wholeheartedly" engage in proselytization and religious indoctrination (majority opn, at 689) is gratuitous and finds no support in the record or in empirical data.

VI.
Many people may believe that A.A. is an entity of spiritual essence or experience. Referenced incorporation of its literature into ASAT to forge a religious alchemy that implicates the Establishment Clause of the First Amendment by some foreboding compulsion feature, however, is not justified or proven. Greater quantum and quality should be required to cross that constitutionally blurred barrier. Indeed, the repeated evocation of a generalized deity figure and symbol or some nondenominational, secular alternative "Higher Power" fails to support this profound absorption of A.A. and ASAT into the territory of a compulsory, constitutionally forbidden religious encounter. We reiterate, in summary, the cogent resolution of this case by the unanimous Appellate Division:
"[I]t is our conclusion that petitioner has failed to *715 make an adequate record to state a claim for an Establishment Clause violation. The petition cites nothing of a religious nature about this particular ASAT program or its practices other than the fact that it is modeled after the principles of AA which make references to `God' and a `Higher Power'. We hold that under the facts and limited record in this case, the inclusion of the 12-step AA component into the ASAT program did not make the program a religious exercise and, therefore, did not violate petitioner's rights under the Establishment Clause of the 1st Amendment" (211 AD2d 187, 194 [Spain, J.]).
Nevertheless, this case is now concluded by this Court with a torrent of competing words and interpretations of the record, relevant authorities and constitutional analysis. In the end, Judge Ciparick and I agree with the lower courts and disagree with the reversal decree here because ASAT and A.A., in their essences and practices, have not been shown to compel or proselytize a State-imposed religious activity and participation generally or as to petitioner that violate the precepts of the Establishment Clause of the First Amendment of the United States Constitution.
Order reversed, etc.
NOTES
[1] The "Twelve Steps" are as follows:

"1. We admitted we were powerless over alcohol  that our lives had become unmanageable.
"2. Came to believe that a Power greater than ourselves could restore us to sanity.
"3. Made a decision to turn our will and our lives over to the care of God as we understood Him.
"4. Made a searching and fearless moral inventory of ourselves.
"5. Admitted to God, to ourselves, and to another human being the exact nature of our wrongs.
"6. Were entirely ready to have God remove all these defects of character.
"7. Humbly asked Him to remove our shortcomings.
"8. Made a list of all persons we had harmed, and became willing to make amends to them all.
"9. Made direct amends to such people wherever possible, except when to do so would injure them or others.
"10. Continued to take personal inventory and when we were wrong promptly admitted it.
"11. Sought through prayer and meditation to improve our conscious contact with God as we understood Him, praying only for knowledge of His will for us and the power to carry that out.
"12. Having had a spiritual awakening as the result of these steps, we tried to carry this message to alcoholics, and to practice these principles in all our affairs" (Alcoholics Anonymous World Services, Inc., Alcoholics Anonymous, at 59-60 [3d ed 1976] [emphasis in original]).
[2] The parties agree that Narcotics Anonymous has adopted the Twelve Steps of A.A. as its guiding principle and that its beliefs and practices do not vary in any significant way from A.A.
[3] It is evident that respondents were relying primarily on a book entitled "Alcoholics Anonymous," subtitled as the "Third Edition of the Big Book, the Basic Text For Alcoholics Anonymous" (Alcoholics Anonymous World Services, Inc. [3d ed 1976]) (hereinafter A.A. Big Book), and a text entitled "Twelve Steps and Twelve Traditions" (Alcoholics Anonymous World Services, Inc. [13th ed 1983]) (hereinafter A.A. Twelve Steps/Twelve Traditions). Although neither of these works was part of the record in the courts below, apparently they were handed up by respondents and they are referred to at length in the Appellate Division's decision (see, 211 AD2d 187, 189-190).
[4] The dissent's criticism of our "inordinate * * * inflation" of A.A. writings because they are "not documented by a customary * * * record basis" (dissenting opn, at 708) is unwarranted. It was respondents, in all courts throughout this proceeding, who have invoked and cited to these A.A. basic doctrinal texts, ostensibly to show that all references to God and prayer in the Twelve Steps were secular. Not even respondents now claim that these writings are not properly before this Court to explain the A.A. 12-steps credo and methodology incorporated in the ASAT Program.
[5] Both the dissent and the Appellate Division rely heavily on A.A.'s "explicit declaration against sectarian preference" as being dispositive (see, dissenting opn, at 701; 211 AD2d, at 190). Torcaso clearly interdicts governmental pressure favoring religion generally  not merely favoring a particular religious sect or sects. This view of the reach of the Establishment Clause is supported by respected constitutional law scholars (see, 4 Rotunda and Nowak, Constitutional Law  Substance and Procedure § 21.3, at 453 [2d ed]; see also, Abington School Dist. v Schempp, 374 US 203, 216-217, supra).
[6] The foregoing opinions of all nine of the Justices in Lee v Weisman dealing with anticoercion as a settled precept of the Establishment Clause either independently or as a prohibited governmental endorsement of religion in violation of the second prong of the three-part Establishment Clause test of Lemon v Kurtzman (supra), effectively dispose of the dissent's criticism that we have wrongfully interjected a "dominant" coercion element (dissenting opn, at 704; see also, id., at 703), in a "novel" (id., at 703) or "tenuous" manner (id., at 697) unsupported by precedent, to Establishment Clause jurisprudence. See also the views of constitutional scholar Laurence Tribe, quoted infra. Our Court also recognized that anticoercion was an essential precept of the Establishment Clause in New York State School Bds. Assn. v Sobol (79 N.Y.2d 333, 337).
[7] The dissent also invokes language in O'Lone v Estate of Shabazz (482 US 342, 349) (dissenting opn, at 710), and relies upon it and other prison inmate cases (id., at 712, 714) in which some limitations on free exercise and free speech rights of inmates have been upheld in balancing those interests against legitimate State penological interests. Moreover, the dissent also cites (id., at 706) with approval Boyd v Coughlin (914 F Supp 828) wherein the United States District Court did apply a balancing test to an inmate's Establishment Clause claim (see, id., at 831-832). Such balancing has never been applied by the Supreme Court in an Establishment Clause case. Adopting a balancing approach here would be unprecedented and raise serious implications beyond the prison context.