OPINION OF THE COURT
Simons, J.
Petitioners John and Jane Doe were married June 6, 1985. At the time, John Doe was an inmate of the Auburn Correctional Facility serving a BVz- to 11-year indeterminate sentence. In October 1985 he qualified for participation in the Family Reunion Program and petitioners subsequently were afforded a two-day conjugal visit in a trailer on prison *51 grounds. In December 1985 John Doe was diagnosed as suffering from Acquired Immune Deficiency Syndrome (AIDS) and respondents, various correction officials, denied petitioners further conjugal visits. Petitioners contend respondents’ ruling violated their State and Federal constitutional rights, was arbitrary and capricious and unlawfully discriminated against John Doe on the basis of his handicap, contrary to provisions of the Federal Rehabilitation Act of 1973 (29 USC § 794).
I
The Family Reunion Program allows selected inmates to spend a period of days with their spouses or various enumerated relatives in a private trailer located within the prison complex but outside the main prison buildings. Its purpose is to "preserve, enhance and strengthen family ties that have been disrupted as a result of incarceration”, thereby enabling inmates to adjust to society more easily when released from prison (7 NYCRR 220.1). The program is not available at all correctional facilities but in those where it is, approval by the administrator is required for each visit and participation is governed by the regulations issued by the Department of Correctional Services (see, 7 NYCRR 220.1 et seq.). Under these regulations, an applicant who has a diagnosed communicable disease may be disqualified from participating in the program unless found eligible after special review (7 NYCRR 220.3 [c] [8]).
In December 1985, upon discovering John Doe had AIDS, correction officials transferred him to the prison hospital. His wife continued to visit him there and in February 1986 John Doe submitted another application seeking permission to participate in the Family Reunion Program. His application was denied and the denial was upheld on administrative appeal on the ground that John Doe had been diagnosed "as having a communicable disease”. Although petitioners acknowledge the nature of Acquired Immune Deficiency Syndrome and recognize its dangers, they deny it is a "communicable disease” or that their participation in the Family Reunion Program may reasonably be denied because John Doe is afflicted with it. Accordingly, they commenced this article 78 proceeding in the nature of mandamus to review the Correction Department’s ruling and also to obtain declaratory relief. Supreme Court declared petitioners’ rights had not been violated and therefore dismissed their petition. The Appellate Division affirmed and we granted petitioners leave to appeal. We now affirm.
*52 II
Preliminarily, we note that petitioners’ attorney informed the court at oral argument that after this appeal had been perfected John Doe was transferred to the Midstate Correctional Facility at Marcy — an institution which has not established a Family Reunion Program. Petitioners’ counsel nevertheless maintains this transfer did not render the appeal moot. We agree. Although petitioners sought an order compelling respondents to permit conjugal visits, relief that cannot be granted at Midstate Correctional Facility, they also sought a declaration of their rights. John Doe remains incarcerated within the correctional system and his particular location is a matter subject to the Commissioner’s broad discretion (see, Correction Law § 23; Matter of Johnson v Ward, 64 AD2d 186, 188). That being so, petitioners have a continuing interest in the litigation because John Doe may be transferred in the future to a facility which has established a Family Reunion Program. Thus, the litigation remains adversarial and "the differences between [petitioners] and [respondents] give rise to a 'justiciable controversy’, for which a declaratory judgment would be an appropriate remedy” (East Meadow Community Concerts Assn. v Board of Educ., 18 NY2d 129, 135; see also, Cohen and Karger, Powers of the New York Court of Appeals § 98, at 417-418 [rev ed]).
¡II
A
Petitioners advance three constitutional claims: that respondents denied petitioners their fundamental right to marital privacy, that they denied them due process of law, and that they denied them equal protection of the laws.
The right to privacy, in constitutional terms, involves freedom of choice, the broad, general right to make decisions concerning oneself and to conduct oneself in accordance with those decisions free of governmental restraint or interference (see, People v Onofre, 51 NY2d 476, 485; 2 Rotunda-NowakYoung, Constitutional Law, Substance and Procedure § 18.26 et seq.). This "right to be let alone” has been called the "most comprehensive of rights and the right most valued by civilized men” (Olmstead v United States, 277 US 438, 478 [Brandeis, J., dissenting]). Among the decisions protected by the right to privacy, are those relating to marriage (Turner v Safley, 482 *53 US —, 107 S Ct 2254; Loving v Virginia, 388 US 1; Griswold v Connecticut, 381 US 479); procreation (Skinner v Oklahoma, 316 US 535); contraception (Eisenstadt v Baird, 405 US 438; Griswold v Connecticut, supra) and personal contact (Cooper v Morin, 49 NY2d 69, cert denied sub nom. Lombard v Cooper 446 US 984 [contact visits, as distinguished from conjugal visits, for pretrial detainees]; see generally, 2 Rotunda-NowakYoung, Constitutional Law, Substance and Procedure §§ 15.7 [as to fundamental rights generally], 18.30 [a] [as to the right to engage in sexual acts]).
An individual does not automatically forfeit all constitutional rights upon conviction of a crime. The courts have recognized, for example, that even those confined to a correctional facility retain rights to freedom of speech (Pell v Procunier, 417 US 817) and freedom of religion (Cruz v Beto, 405 US 319; Matter of Rivera v Smith, 63 NY2d 501); the right to petition the government for redress of grievances, which includes access to courts (Johnson v Avery, 393 US 483); that they are protected against invidious discrimination (Lee v Washington, 390 US 333); and that they may claim protection of the Due Process Clause to prevent additional deprivation of life, liberty or property without due process of law (Wolff v McDonnell, 418 US 539). Relevant to this appeal, the Supreme Court has recently held that inmates retain some privacy rights, specifically the right of an inmate serving less than a life sentence to marry (see, Turner v Safley, 482 US —, 107 S Ct 2254, supra; cf., Johnson v Rockefeller, 365 F Supp 377, affd sub nom. Butler v Wilson, 415 US 953; and Matter of Fitzpatrick v Smith, 90 AD2d 974, affd 59 NY2d 916 [both holding Civil Rights Law § 79-a constitutional]).
Nevertheless, an inmate is constitutionally deprived of his liberty upon conviction and sentence of imprisonment, and his rights are necessarily limited by the realities of confinement and by the legitimate goals and policies of the correctional system (O’Lone v Estate of Shabazz, 482 US —, 107 S Ct 2400, 2404; Bell v Wolfish, 441 US 520, 546). As a general proposition, an inmate retains only those rights which "are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system” (Pell v Procunier, supra, at 822; see also, Turner v Safley, 482 US, at —, 107 S Ct, at 2261, supra; Hudson v Palmer, 468 US 517, 525; Jones v North Carolina Prisoners’ Union, 433 US 119, 125; Matter of Rivera v Smith, supra, at 510). Traditionally, intimate marital relations have been deemed inconsistent *54 with incarceration because the very purpose of confinement is to remove the prisoner from society for punishment and to serve valid governmental interests of security, deterrence and rehabilitation. Inasmuch as these interests can be furthered by denying intimate contact during the period of incarceration courts have uniformly concluded that neither a prisoner nor his spouse has a right to intimate marital relations during a prisoner’s confinement and that the State is under no obligation to establish conjugal visitation programs (see, Matter of Mary of Oakknoll v Coughlin, 101 AD2d 931; In Re Cummings, 30 Cal 3d 870, 640 P2d 1101; McGinnis v Stevens, 543 P2d 1221, 1237-1238 [Alaska]; see also, Polakoff v Henderson, 488 F2d 977, affg 370 F Supp 690; Tarlton v Clark, 441 F2d 384, cert denied 403 US 934; Payne v District of Columbia, 253 F2d 867; Lyons v Gilligan, 382 F Supp 198; Stuart v Heard, 359 F Supp 921; see generally, Annotation, State Regulation of Conjugal or Overnight Familial Visits in Penal or Correctional Institutions, 29 ALR4th 1216; Note, Conjugal Visitation Rights and the Appropriate Standard of Judicial Review for Prison Regulations, 73 Mich L Rev 398, 403 [1974]). Accordingly, petitioners’ privacy claim must be rejected: although prisoners retain some rights to privacy, the right to conjugal relations has not been included among them (see, Turner v Safley, 482 US —, 107 S Ct 2254, 2265, supra [enumerating several incidents of marriage which survive imprisonment but not including among them the right to conjugal relations]).
Petitioners next contend that even if their constitutional right to marital privacy is foreclosed by confinement, they have a right to conjugal visits because respondents have established the Family Reunion Program. They have not articulated the basis for such a claim, but it is implicit in their submission and rests upon the belief that even if John Doe’s constitutional right to privacy does not survive incarceration, the State has given petitioners a legitimate expectation that they would be afforded conjugal visits by implementing the Family Reunion Program and that such expectation gives rise to a constitutional interest protected by due process principles.
In Matter of Russo v State Bd. of Parole (50 NY2d 69) we denied petitioners’ claim but we recognized nevertheless that prisoners may acquire, by regulation, constitutional rights lost upon incarceration. Thus, we stated that although a prisoner’s right to liberty is extinguished by incarceration and there is no inherent right to parole, "when a State adopts a [regula *55 tory] scheme which creates a legitimate expectation” of early release from prison, there "exists a liberty interest deserving of constitutional protection” (id., at 73-74). If regulations affirmatively promise that benefits will be granted in the absence of prohibited findings or circumstances, then a protected interest may arise (Russo v State Bd. of Parole, supra, at 74; see also, Connecticut Bd. of Pardons v Dumschat, 452 US 458, 464-465 [commutation of sentence]; Greenholtz v Nebraska Penal Inmates, 442 US 1, 9-10 [parole release]; Meachum v Fano, 427 US 215, 225 [prison transfer]; Wright v Cuyler, 517 F Supp 637 [prerelease family visits]; cf, Matter of Economico v Village of Pelham, 50 NY2d 120, 127). It is the inmate’s legitimate expectation of the benefit which creates the protected constitutional interest, however, not the possibility that a benefit may be received. Thus, the structure of the decision-making process is at least as important as the likely result of the process. If access to a program is based upon objective criteria, individuals satisfying such criteria may possess a legitimate expectancy worthy of constitutional protection. When access to such programs is contingent upon subjective factors no such expectancy is warranted and no constitutional right arises (see, Greenholtz v Nebraska Penal Inmates, supra, at 9-10; and see, Leis v Flynt, 439 US 438, 441-442; Board of Regents v Roth, 408 US 564, 577-578; Perry v Sindermann, 408 US 593, 599-603).
Given the present regulatory scheme of the Family Reunion Program, petitioners could have no legitimate expectation that they would be afforded conjugal visits. The regulations provide that in determining whether a particular prisoner shall be granted access to the program, in those institutions maintaining one, respondents must consider and balance 15 guidelines.[1] Many of these entail consideration of subjective factors, including qualitative estimates of the extent to which the prisoner has been rehabilitated and whether he has a propensity for disruptive behavior or sexual misconduct. Al *56 though the regulations establish guidelines, the guidelines do not create an entitlement of conjugal visits because the review system is heavily discretionary and holds out no more than the possibility of conjugal visits (see, Matter of Russo v State Bd. of Parole, supra, at 75; Greenholtz v Nebraska Penal Inmates, supra, at 9-12; Boothe v Hammock, 605 F2d 661, 663-664; cf., Board of Regents v Roth, supra; Perry v Sindermann, 408 US 593, supra). Moreover, even though an inmate has previously been approved and participated in the program, there can be no legitimate expectation of continued participation because the regulations provide that inmates must reapply each time they seek a visit, and each application is subjected to a new discretionary review (7 NYCRR 220.4 [a] [2] [iv]X
In sum, the limitations of prison life require that an inmate forfeit his right to marital intimacy. Respondents’ institution of a Family Reunion Program does not revive that right nor does it create an analogous liberty interest because, given the program’s discretionary nature, inmates do not have a legitimate expectation that they will participate in it.
Petitioners’ final constitutional contention is that the manner in which the conjugal visit program was administered in this case violated their right to equal protection of the laws (US Const, 14th Amend, § 1; NY Const, art I, § 11). Petitioners contend they were denied equal protection because respondents did not afford them conjugal visits when such visits were permitted between other prisoners and their spouses.
It is settled that the right to equal protection of the laws survives incarceration (see, Lee v Washington, 390 US 333, supra; Durso v Rowe, 579 F2d 1365, cert denied 439 US 1121) and that administrative as well as legislative classifications are subject to equal protection review (see, Turner v Safley, 482 US —, 107 S Ct 2254, supra; Buckley v Coyle Pub. School Sys., 476 F2d 92). Equal protection does not require absolute equality, however, or precisely equal advantages. Rather, in the absence of a classification affecting fundamental rights or creating suspect classifications which must be invalidated unless justified by some compelling State interest, equal protection requires only that a classification which results in unequal treatment rationally further "some legitimate, articulated state purpose” (McGinnis v Royster, 410 US 263, 270; Ross v Moffitt, 417 US 600; Foss v City of Rochester, 65 NY2d 247, 256-257; see also, Cordero v Coughlin, 607 F Supp 9, 10; *57 see generally, 2 Rotunda-Nowak-Young, Constitutional Law, Substance and Procedure § 15.4, at 60, 65-69; § 18.3, at 322-324; see also, Merritt, Communicable Disease and Constitutional Law: Controlling AIDS, 61 NYU L Rev 739, 783-799 [1986]). Because the entitlement of selected inmates to conjugal visits is not a matter of constitutional right, and because the Department of Correctional Services, in distinguishing prisoners with communicable diseases[2] from those not similarly situated, has not based its decision on a suspect classification, petitioners’ equal protection claim must be rejected if the Correction Department’s ruling bears a rational relationship to a legitimate State purpose.
It is recognized that the State has a substantial interest in preventing the transmission and spread of communicable diseases (see, Jacobson v Massachusetts, 197 US 11, 27; Crayton v Larabee, 220 NY 493, 501). Acquired Immune Deficiency Syndrome is such a disease. It is caused by the human immunodeficiency virus, a virus transmitted by direct exposure to blood, semen or breast milk and which mothers also can transmit to their children before birth. Many infected individuals remain asymptomatic for long periods of time but they represent a significant health concern because authorities generally agree that once the virus enters a person’s body it is virtually impossible to eliminate from the system and may eventually lead to AIDS or AIDS Related Complex, a less serious condition. Once acquired, AIDS undermines the human body’s ability to combat infection, it is incurable and it is almost always fatal (see, National Institute of Justice, U.S. Department of Justice, AIDS in Prisons and Jails: Issues and Options [1986]; Merritt, Communicable Disease and Constitutional Law: Controlling AIDS, 61 NYU L Rev 739, 742-754; Orland and Wise, The Aids Epidemic: A Constitutional Conundrum, 14 Hofstra L Rev 137, 143-148 [1985]). Given the recognized danger of AIDS and the fact that respondents cannot guarantee the disease would not be spread to a nonprisoner if petitioners are afforded conjugal visits, respondents had a rational basis for their determination that it was a communicable disease and for their decision to deny John Doe’s application because he was suffering from it. Petitioners’ contentions that AIDS is not highly contagious, that they *58 would reduce the danger of its transmission through safe sexual practices, or that they might not engage in sexual relations during a trailer visit does not make respondents’ decision any less rational (see, Jacobson v Massachusetts, supra, at 30-31). The possibility remains that permitting petitioners’ participation in the conjugal visit program may result in the spread of a serious communicable disease.[3]
Petitioners also maintain that respondents’ decision may not stand because it is based upon respondents’ concern for the health of nonprisoners. Relying upon Pell v Procunier (417 US 817, 822, supra), they assert correction authorities may only limit inmate rights in accordance with "penological objectives” and that respondents exceeded their power in this case because they relied on societal, not penal, concerns in denying John Doe’s application. The dissent presents a variation of the same argument. It assumes that petitioners retain a fundamental right to marital intimacy despite John Doe’s confinement and it contends, therefore, that denying conjugal visits must be justified by some penological purpose.
The argument fails to recognize that petitioners’ claim differs from that presented in Pell and similar cases. Pell addressed the power of correction officials to restrict an inmate’s fundamental constitutional right to freedom of speech. Since that right is not inconsistent with incarceration and survives the inmate’s confinement, the court held that any limitation of it must be narrowly tailored and justified by penological objectives (see, Pell v Procunier, supra; see also, Turner v Safley, 482 US —, 107 S Ct 2254, supra; Matter of Rivera v Smith, 63 NY2d 501, 510, supra). We have recognized in this case that the fundamental constitutional right to privacy includes a right to marital intimacy, but we agree with the overwhelming, perhaps unanimous, body of judicial authority that all inmates, whether they are infected with communicable diseases or not, forfeit this right upon incarceration for the most basic and legitimate penological reasons, punishment, security and deterrence. That conjugal programs *59 have been instituted in some institutions does not revive the right forfeited by confinement. To hold otherwise would be tantamount to saying that an inmate when incarcerated does not forfeit his constitutional right to travel if prerelease home visit programs are established at some facilities.
In sum, the contested regulations here differ from those in Pell which restricted rights retained by prisoners because rather than restrict a right, they regulated a benefit available to those qualified.
Moreover, respondents acted in conformity with authority granted to them by the Legislature. The conjugal visit program is a rehabilitative measure established pursuant to statutory directive to assist "sentenced persons to live as law abiding citizens” (Correction Law § 70 [2]; see, 7 NYCRR 200.1, 220.1; Jacobs and Steele, Sexual Deprivation and Penal Policy, 62 Cornell L Rev 289, 292 [1977]; Note, Conjugal Visitation Rights and the Appropriate Standard of Judicial Review for Prison Regulations, 73 Mich L Rev 398, 419). The establishment of such programs comes within the authority delegated to correction officials to exercise general responsibility for care and confinement of criminals and for instituting programs for their treatment and rehabilitation. The fulfillment of those penological objectives requires administrative regulations consistent not only with the safety and health of those within the prison facility, but also with the safety of society generally. Indeed, Correction Law § 70 (2) (a) specifically directs that the Department of Correctional Services must, in maintaining prison facilities and establishing rehabilitation programs, give "due regard to * * * the safety and security of the community”. Preventing the spread of communicable diseases to those outside the prison comes within the statutory direction. The dissent asserts that the Commissioner is barred from considering health when he acts to protect the safety and security of the public under Correction Law § 70 (2) (a). This conclusion defies the settled rules of statutory interpretation, and offends logic as well; it would leave the Commissioner powerless to contain even an epidemic from spreading beyond an institution.
The courts traditionally have deferred to the discretion of correction officials on matters relating to the administration of prison facilities and rehabilitation programs (see, Reddin v Israel, 455 F Supp 1215, 1222; Hayes v Cuyler, 475 F Supp 1347, 1350; O’Lone v Estate of Shabazz, 482 US —, 107 S Ct *60 2400, 2407, supra; see also, Block v Rutherford, 468 US 576, 584-585; Bell v Wolfish, 441 US 520, 547, supra). As long as the line drawn between those entitled to participate and those excluded is rationally drawn, the courts will not interfere (see, French v Heyne, 547 F2d 994, 998). In this case, respondents had the power to institute a conjugal visit program and to determine who should participate in it. Since the classifications they adopted for that purpose bore a rational relationship to the proper and successful operation of the program and particularly to the spread of communicable diseases to nonprisoners, it did not violate petitioners’ rights to equal protection of the laws. Finally, we note that Jane Doe’s rights are no greater than those of her husband under the circumstances presented, and her constitutional claim also was properly denied (see, Payne v District of Columbia, 253 F2d 867, supra; Lyons v Gilligan, 382 F Supp 198, supra).
B
Petitioners contend further that even if their constitutional rights have not been violated, respondents’ determination should be set aside pursuant to CPLR 7803 (3) as arbitrary and capricious. Their argument is that correction officials erred in classifying AIDS as a communicable disease; they support it by noting that regulations promulgated by the Health Department classify AIDS as a "reportable” disease, not a "communicable” disease (see, 10 NYCRR 2.1, 24-1.1).
Regardless of the Health Department’s regulations, however, it is agreed that AIDS can be transmitted from person to person by direct exposure to blood, semen or breast milk. That being so, AIDS is routinely viewed as a communicable disease (see, National Institute of Justice, U.S. Department of Justice, AIDS in Prisons and Jails: Issues and Options, op. cit.; Spiegel, Privacy, Sodomy, AIDS & The Schools: Case Studies in Equal Protection, 1986 Ann Survey of Am L 221, 247, n 174; McGuirl and Gee, AIDS: An Overview of the British, Australian, and American Responses, 14 Hofstra L Rev 107 [1985]). Respondents’ determination is consistent with this view and their efforts to prevent its transmission during conjugal visits were therefore rational and should be upheld irrespective of the definition set forth in the Health Department regulations (see, Matter of Pell v Board of Educ., 34 NY2d 222, 231).
C
Finally, John Doe contends respondents violated his rights *61 as a handicapped person protected by section 504 of the Federal Rehabilitation Act of 1973 (29 USC § 794). Respondents reply that in this case they are not subject to the provisions of the act. Assuming they are, however, John Doe must demonstrate he is "otherwise qualified” to participate in the conjugal visit program to state a section 504 claim (id.; School Bd. v Arline, 480 US 273, 107 S Ct 1123, 1131, n 17). "An otherwise qualified person is one who is able to meet all of a program’s requirements in spite of his handicap” (Southeastern Community Coll, v Davis, 442 US 397, 406). To be qualified for participation in the Family Reunion Program, applicants must be free of communicable disease. Because John Doe was afflicted with AIDS, and AIDS is a communicable disease, he was not qualified for the program and was reasonably excluded. He thus has no section 504 claim.
Accordingly, the order of the Appellate Division should be affirmed.

. The 15 factors are the prisoner’s: (1) length of time in incarceration; (2) degree of institutional adjustment; (3) eligibility for temporary release; (4) security classification; (5) assignment to a special housing unit; (6) pattern of disruptive behavior; (7) prior violations of Family Reunion Program regulations; (8) designation as a central monitoring case; (9) outstanding warrants; (10) nature of conviction; (11) parole violation status; (12) protective custody status; (13) participation in some other special program; (14) assignment to mental hygiene unit; (15) diagnosis as having a communicable disease (7 NYCRR 220.3 [a]-[c]).

. The classification at issue — inmates with communicable diseases — is considerably broader than inmates with AIDS and would apply, for example, to inmates with hepatitis or venereal diseases.

. The dissent contends that the rationale for respondent’s decision, injury to others outside the prison, is necessarily based on the speculation that Jane Doe will commit adultery. On the contrary, the HIV virus, once acquired, cannot be eliminated from a person’s body and given the possibility that Jane Doe may become pregnant and transmit the disease to her child or that she may become single in the future, either by divorce or widowhood, respondents’ concern manifestly extends beyond assumption of the risk involved to her personally.