**William GORDON, Jr. and Brenda Gordon, Plaintiffs,**

v.

**WOODBOURNE CORRECTIONAL FACILITY, Raymond Cunningham, individually and in his capacity as Superintendent of Woodbourne Correctional Facility, and Thomas Briggs, Defendants.**

No. 05 Civ. 5894(WCC).

United States District Court, S.D. New York.

March 12, 2007.

264

The Law Offices of Brian W. Raum, P.C. (Brian W. Raum, of counsel), New York, NY, for Plaintiffs.

Eliot Spitzer, Attorney General of the State of New York (John M. Schwartz, Asst. Attorney General, of counsel), New York, NY, for Defendants.

WILLIAM C. CONNER, Senior District Judge.

Plaintiffs William Gordon, Jr. ("Gordon") and Brenda Gordon ("Brenda") (collectively, "plaintiffs") bring this action, pursuant to 42 U.S.C. § 1983, against defendants Woodbourne Correctional Facility ("Woodbourne"),[1] Raymond Cunningham[2] ("Cunningham") and Thomas Briggs[3] ("Briggs") (collectively, "defen-

---

1. Woodbourne is a medium security men's prison operated by the New York State Department of Correctional Services ("DOCS") in Woodbourne, New York and is where Gordon is currently incarcerated.

2. Cunningham is the Superintendent of Woodbourne. (See Complt. ¶ 10; Defs. Rule 56.1 Stmt. ¶ 4.)

3. Briggs is a Senior Guidance Counselor at Woodbourne and supervises counselors in charge of the Family Reunion Program ("FRP"). The FRP is a DOCS program pursuant to which selected inmates are allowed extended, private visits with their families, including conjugal visits with their spouses. (See Briggs Decl. ¶¶ 1–4; Defs. Rule 56.1 Stmt. ¶¶ 5–6.)

dants") for violations of their constitutional rights guaranteed by the Fourteenth Amendment to the United States Constitution. Specifically, plaintiffs claim that defendants violated the Due Process and Equal Protection Clauses of the United States Constitution by denying them conjugal visits while Gordon was imprisoned at Woodbourne. Defendants now move this Court for summary judgment on all counts. For the reasons that follow, defendants' motion is granted.

## BACKGROUND

When viewed in the light most favorable to plaintiff,[4] the record reveals the following relevant facts. Since 1995, Gordon has been in the custody of DOCS and was an inmate of Eastern Correctional Facility ("Eastern") from 1995 to 2001. (*See* Defs. Rule 56.1 Stmt. ¶ 1.) On August 6, 1997, while Gordon was incarcerated, plaintiffs applied for a marriage license from the Town Clerk of the Town of Wawarsing, New York. (*See* Complt. ¶ 12.) Gordon submitted to the Town Clerk the application form and marriage licensing fee. (*See id.* ¶ 12.) In addition, because Gordon had been previously married, he was required to provide documentation verifying that he had received a legal divorce from his first spouse. (*See id.* ¶ 12.) Accordingly, Gordon submitted to the Town Clerk a copy of the divorce decree that indicated that his previous marriage was in fact dissolved. (*See id.* ¶ 12; Briggs Decl., Ex. C.) Although Gordon's prior marriage occurred in New York, he sought divorce in a Mexican court, which issued the divorce decree.[5] (*See* Briggs Decl., Ex. C, p. 1.) Upon review of plaintiffs' application, the Town Clerk issued plaintiffs a marriage license. (*See* Defs. Rule 56.1 Stmt. ¶ 3; Complt. ¶ 13.)

On August 22, 1997, Gordon, while an inmate at Eastern, married Brenda and they thereafter participated in the FRP and were allowed conjugal visits during which they conceived their two children. (*See* Complt. ¶¶ 14–16; Defs. Rule 56.1 Stmt. ¶ 3; Briggs Decl. ¶ 6.) The FRP was created by DOCS "to preserve, enhance and strengthen family ties that have been disrupted as a result of incarceration." (*See* Briggs Decl. ¶ 3; Defs. Rule 56.1 Stmt. ¶ 7.) *See also* N.Y. Comp.Codes R. & Regs., Title 7, § 220.1. Among other privileges, the program provides for conjugal visits between selected inmates and their "legal spouses," which is defined as a "wife of the inmate to whom [ ]he has been married for at least 90 days, and who is not [ ]herself an inmate of a state correctional facility." *See* N.Y. Comp.Codes R. & Regs., Title 7, § 220.3. In order to participate in the program, the spouses "must possess documentation of a valid marriage license or a declaratory judgment stating the validity of an out-of-state common-law marriage." *See id.*

According to plaintiff, in May 2001, the Town Clerk commenced "a policy" of reviewing the validity of marriage licenses

---

**4.** *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (" 'In assessing the record to determine whether there is [a genuine issue of material fact], the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.' ") (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir.1997)); *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486 (2d Cir.2006) ("We [must] ... constru[e] the facts in the light most favorable to the non-moving party...."); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 Civ. 1895, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) ("In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party.").

**5.** The divorce decree was issued by a court in Villahermosa, State of Tabasco, Mexico. (*See* Briggs Decl., Ex. C.)

issued to the inmates of Eastern. (*See* Complt. ¶¶ 17–18.) In a letter to Gordon dated May 14, 2001, the Town Clerk indicated that there were several irregularities regarding plaintiffs' application with respect to the status of his previous marriage. (*See* Briggs Decl., Ex. A; Complt. ¶¶ 17–20.) The letter stated:

I am writing to you concerning your divorce papers.... I have been informed by our [Town] Attorney of the following[:]

(1) your divorce papers translated must be signed by a Court Clerk with a legal raised seal from the court where the divorce took place.

(2) only original divorce papers are acceptable when getting another marriage license.

(3) a call was made to the Civil Court of First Instance and they do not have a Judge Javier Torres Castro or Ausencio Zurita Lopez working in their court.

(4) your translated divorce papers say you appeared before the court with legal representative[;] this is impossible as you have been incarcerated since 1995[sic]

(5) the person you were divorcing did not have legal representation.

(6) there has to be an established domicile.

(*See id.*) The letter also attached a section of what appears to be an excerpt from a manual for Town Clerks which states: "Regarding foreign divorces, the applicant should provide a certified translation with the divorce papers. Generally, foreign divorces are recognized in New York State if one of the parties personally appears in the foreign jurisdiction and establishes domicile and the other party is represented by an attorney." (*See id.*) It further states: "We strongly recommend that clerks seek the assistance of their town attorney or city corporation counsel in determining the validity of the divorce in New York State.... [T]he town attorney or corporation counsel may want to consult with the State Health Department ... in making a determination." (*See id.*) Although this letter is unclear as to whether it was intended to declare plaintiffs' marriage a nullity, plaintiffs allege, and defendants do not dispute, that the Town Clerk intended that the marriage be nullified. (*See* Complt. ¶ 19.)

On July 19, 2001, in light of the Town Clerk's determination that plaintiffs' marriage was invalid, Gordon was advised by the Family Services Program Coordinator at Eastern that he was no longer allowed to participate in conjugal visits. (*See* Complt. ¶ 21; Raum Decl., Ex. A.) Gordon filed a grievance, but was unsuccessful in getting his conjugal visits privilege reinstated. (*See* Complt. ¶ 25.) Thereafter, on July 20, 2001, Gordon was transferred from Eastern to Woodbourne where his participation in the FRP remained prohibited.[6] (*See* Complt. ¶ 26.)

On January 21, 2003, plaintiffs filed an action against the Town Clerk, the Town of Wawarsing, David Miller ("Miller"), who was the Superintendent of Eastern, and John Keane ("Keane"), who, at the time, was the Superintendent of Woodbourne. (*See* Schwartz Decl., Ex. C.) Plaintiffs alleged, in substance, that defendants deprived them of their fundamental right to marry. (*See id.*) That action was assigned to Judge Charles L. Brieant of this Court. Miller thereafter filed a motion to dismiss and, in a Memorandum and Order dated July 11, 2003, Judge Brieant dismissed the claims against Miller, reasoning that Miller had no involvement in the issu-

---

**6.** However, as Judge Brieant discussed in the related case of *Gordon v. Wawarsing,* Gordon never applied for conjugal visits when he was first transferred to Woodbourne. (*See* Schwartz Decl., Ex. E, p. 4.)

ance or nullification of plaintiffs' marriage license and, in addition, that plaintiffs had no Fourteenth Amendment right to participate in the FRP or to have conjugal visits. (*See id.*, Ex. E, pp. 1, 6–8.) In the fact section of the Memorandum and Order, Judge Brieant stated that it was *"ultra vires"* for the Town Clerk to purportedly nullify plaintiffs' marriage after the issuance of their marriage license. On March 8, 2004, as a likely consequence of Judge Brieant's decision, the remaining defendants settled with plaintiffs in the amount of $30,000 and the action was discontinued. (*See id.*, Ex. F.)

During the pendency of that litigation, Gordon applied for participation in the FRP. (*See* Briggs Decl. ¶ 6; Defs. Rule 56.1 Stmt. ¶ 9; Pls. Rule 56.1 Stmt. ¶ 9.) The application process involves "a thorough process of consideration and approvals, involving the facility Family Services Coordinator, the inmate's corrections counselor, the Deputy Superintendent for Security or his designee, the facility Superintendent or his designee, an Assistant Commissioner of Corrections or his designee in the Central Office of DOCS in Albany and the facility Health Services Unit." (*See* Briggs Decl. ¶ 3.) Gordon was selected to participate in the FRP and had conjugal visits with his spouse in December 2003, April 2004 and September 2004. (*See* Briggs Decl. ¶ 6; Defs. Rule 56.1 Stmt. ¶ 9; Pls. Rule 56.1 Stmt. ¶ 9; Raum Decl., Ex. C.)

However, according to defendants, in September 2004, the Coordinator of the Woodbourne FRP informed Briggs that documents found in Gordon's inmate file created doubt as to the validity of plaintiffs' marriage. (*See* Briggs Decl. ¶ 7; Defs. Rule 56.1 Stmt. ¶ 10.) Defendants claim that the documents included the 2001 letter from the Town Clerk, a photocopy of the divorce decree that Gordon submitted to the Town Clerk in 1997 and a English

translation thereof. (*See id.*) Briggs alleges that he was particularly concerned because the divorce decree indicated that Gordon had personally appeared before the court in Mexico in 1997 at which time Gordon was incarcerated in Eastern. (*See* Briggs Decl. ¶ 8; *see also* Defs. Rule 56.1 Stmt. ¶ 14; Pls. Rule 56.1 Stmt. ¶ 14.)

On October 6, 2004, Briggs advised plaintiff that the apparent invalidity of his marriage with Brenda "raised problems with his future participation in the FRP." (*See* Briggs Decl. ¶ 9; Defs. Rule 56.1 Stmt. ¶ 15; Pls. Rule 56.1 Stmt. ¶ 15.) Briggs informed Gordon that he would not be eligible to participate in the FRP unless he produced documentation verifying the validity of his marriage, *e.g.*, "a certified copy of the Mexican [d]ecree with the raised seal of the Mexican court[ ] that might assure [him] that the Mexican [d]ecree was genuine." (*See* Briggs Decl. ¶ 9; Defs. Rule 56.1 Stmt. ¶ 16; Pls. Rule 56.1 Stmt. ¶ 16.) According to Briggs, Gordon informed him that he had previously brought a lawsuit against the Town of Wawarsing regarding this matter and that the court had ruled that his marriage was valid and awarded him $30,000. (*See* Briggs Decl. ¶ 9.) Briggs requested that Gordon provide him with a copy of the court's decision. He also requested the opportunity to speak to Gordon's lawyer. (*See* Briggs Decl. ¶ 9.) Gordon failed to provide any documentation or call his attorney, and instead informed Briggs that he intended to file a lawsuit against him personally and the Woodbourne facility. (*See* Briggs Decl. ¶¶ 9, 11; Defs. Rule 56.1 Stmt. ¶ 18; Pls. Rule 56.1 Stmt. ¶ 18.) He also filed a grievance regarding his exclusion from the FRP and thereafter defendants repeatedly requested that Gordon produce documentation verifying the validity of his marriage with Brenda. Plaintiffs continued to ignore defendants' requests.

(*See* Briggs Decl. ¶¶ 10–11; Defs. Rule 56.1 Stmt. ¶ 17; Pls. Rule 56.1 Stmt. ¶ 17.)

On January 14, 2005, plaintiffs' attorney, Brian W. Raum ("Raum"), wrote the Attorney General's Office indicating that Gordon had been denied conjugal visits based upon questions surrounding the validity of Gordon's divorce and that Judge Brieant had previously ruled that the Town Clerk had no authority to nullify their marriage. (*See* Raum Decl., Ex. F.) Raum wrote the Attorney General's Office again on March 22, 2005 reiterating his concerns and indicating that if Woodbourne did not allow plaintiffs to have conjugal visits, he would be forced to file another action in federal court. (*See* Raum Decl., Ex. G.) The Attorney General's Office failed to respond to Raum's letters. (*See* Raum Decl. ¶¶ 16, 17.)

On June 1, 2005, plaintiffs commenced this action. Disregarding some clearly inappropriate allegations,[7] the Complaint alleges that defendants violated plaintiffs' constitutional rights by: (1) denying plaintiffs' "their rights and privileges of marriage without due process of law"; (2) denying plaintiffs the enjoyment of "a fundamental right" without a compelling government interest in violation of the Equal Protection Clause; and (3) discriminating against plaintiffs, without any rational basis, in violation of the Equal Protection Clause by treating them differently than similarly situated individuals. (*See* Complt. ¶¶ 43, 44, 46, 49.) Plaintiffs seek a declaration that "[p]laintiffs' marriage is valid pursuant to law[,]" an "injunction directing [d]efendants to recognize [p]laintiffs' marriage and return to them all of the rights and privileges to which they are

entitled[,]" compensatory damages in the amount of two million dollars, an award of punitive damages and attorneys' fees pursuant to 42 U.S.C. § 1988. (*See* Complt., "Wherefore.")

According to defendants, after the commencement of this action, Briggs for the first time obtained a copy of Judge Brieant's decision in the earlier litigation and thereupon allowed plaintiffs to participate in the FRP, particularly in light of Judge Brieant's statement with respect to the validity of plaintiffs' marriage. (*See* Briggs Decl. ¶¶ 10–11; Defs. Rule 56.1 Stmt. ¶ 25; Pls. Rule 56.1 Stmt. ¶ 25.) Plaintiffs had a conjugal visit pursuant to the FRP in April 2006 and were scheduled to have one in November 2006 at the time this motion was filed. (*See* Briggs Decl. ¶ 12; Defs. Rule 56.1 Stmt. ¶ 25; Pls. Rule 56.1 Stmt. ¶ 25.) Defendants submit that "[t]he information now in [Gordon's] file will permit his conjugal visits to continue, absent changes in circumstances such as health or disciplinary issues or a change in … plaintiffs' relationship." (*See* Defs. Rule 56.1 Stmt. ¶ 26; Pls. Rule 56.1 Stmt. ¶ 26.)

Defendants move for summary judgment and argue that: (1) plaintiffs' claims are barred by the doctrine of collateral estoppel; (2) plaintiffs have neither pleaded nor supported any constitutional claims; and (3) defendants are protected by the doctrine of qualified immunity. Plaintiffs', for their part, contend that: (1) collateral estoppel is not a bar to the present action; and (2) defendants' motion for summary judgment is premature.

---

7. Plaintiff's attorney appears to have copied the Complaint from the earlier action before Judge Brieant, and in doing so, has asserted allegations that have no applicability to defendants. (*See generally* Complt.) For example, plaintiffs allege that defendants denied them the right to marry. (*See* Complt. ¶ 40.)

Clearly, however, defendants, as correctional officials, have no involvement in granting or denying plaintiffs a marriage licence or have the authority to otherwise affect the legal status of plaintiffs' marriage. Rather, defendants have simply excluded plaintiffs from participating in the FRP.

## DISCUSSION

### I. *Legal Standard*

Under FED.R.CIV.P. 56, a motion for summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." It is axiomatic that " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At this stage of litigation, the Court's role is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994). In doing so, the Court must resolve all ambiguities and draw all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

" 'Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.' " *Hill v. Rayboy–Brauestein*, 467 F.Supp.2d 336, 349 (S.D.N.Y. 2006) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995)). The nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysi-cal doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bush v. Fordham Univ.*, 452 F.Supp.2d 394, 405 (S.D.N.Y. 2006) ("In making its showing that a genuine issue of material fact exists, the non-moving party may not rely on 'the mere existence of a scintilla of evidence' to support its position, but must instead proffer 'evidence on which the jury could reasonably find for the [plaintiff].' ") (quoting *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir.2004)). "However, summary judgment should only be granted '[i]f *after discovery*, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000) (quoting *Berger v. United States*, 87 F.3d 60, 65 (2d Cir.1996)) (quoting *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548) (emphasis in original; alterations in original).

### II. *Collateral Estoppel*

Defendants first argue that plaintiffs' claims are barred by the doctrine of collateral estoppel as a result of the decision of Judge Brieant in the prior action. (*See* Defs. Mem. Supp. Summ. J. at 10–12.) Plaintiffs contend, however, that "[t]his case arises under completely different facts and involves completely different parties." (*See* Pls. Mem. Opp. Summ. J. at 3–4.)

■ Under the doctrine of collateral estoppel, *i.e.*, issue preclusion, "a plaintiff is prevented from relitigating in a subsequent proceeding an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Austin v. Downs, Rachlin & Martin*, 114 Fed.Appx. 21, 22 (2d Cir.2004) (citing *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir.2002)). "Under

federal law,[8] collateral estoppel applies when: '(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" *Id.* (quoting *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 91 (2d Cir.1997) (internal quotation marks omitted)).

In the first action, plaintiffs alleged that, in July 2001, Eastern canceled their conjugal visits on the basis of the Town Clerk's decision that their marriage was invalid. (*See* Schwartz Decl., Ex. C ¶¶ 22–23.) They also alleged that, when Gordon was transferred to Woodbourne, they were denied conjugal visits. (*See id.* ¶¶ 23, 25, 27.) However, in the present action, plaintiffs allege that Gordon was eventually selected to participate in FRP at Woodbourne as a result of Judge Brieant's statement that the nullification of plaintiffs' marriage was improper and, consequently, plaintiffs had conjugal visits in December 2003, April 2004 and September 2004. (*See* Briggs Decl. ¶ 6; Defs. Rule 56 .1 Stmt. ¶ 9; Pls. Rule 56.1 Stmt. ¶ 9; Raum Decl., Ex. C.) Then, in October 2004, defendants, none of whom were involved in the first litigation, terminated plaintiffs' participation in the FRP after discovering the Town Clerk's letter in Gordon's file. Plaintiffs allege that defendants' actions violated their rights under the Due Process Clause and Equal Protection Clauses of the United States Constitution.[9]

■ Although the present action involves subsequent, distinct actions carried out by different individuals than those involved in the action before Judge Brieant, it raises identical legal issues.[10] Judge Brieant dismissed plaintiffs' Due Process and Equal Protection claims on the basis that plaintiffs, as a matter of law, have no liberty interest in conjugal visits. This legal ruling was the necessary basis for the decision dismissing that action. Because plaintiffs had a full and fair opportunity to litigate those issues in the prior action, there is no reason why they should be allowed to litigate them again in this action. In any event, even if Judge Brieant's decision did not require partial dismissal[11] of this action under the doctrine of collateral estoppel, we would decide the legal issues the same way he did.

### III. *Due Process Claims*

■ Plaintiffs first allege that defendants denied them the right to conjugal visits and to participate in the FRP in violation of the Due Process Clause of the Fourteenth Amendment.[12] Of course, a

---

8. "[F]ederal law on collateral estoppel applies to determine the preclusive effect of a prior federal judgment." *Austin,* 114 Fed.Appx. at 22 (citing *Marvel Characters,* 310 F.3d at 286; *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 42 (2d Cir.1986)).

9. Plaintiffs assert two causes of action under the Equal Protection Clause: (1) the selective denial of plaintiffs' fundamental right to conjugal visits; and (2) a "class-of-one," disparate treatment claim, which plaintiffs did not assert in the litigation before Judge Brieant.

10. Defendants in both actions engaged in identical conduct: they denied conjugal visits to plaintiffs because of the apparent illegality of the Mexican divorce and the consequent invalidity of plaintiffs' marriage.

11. Plaintiffs' "class-of-one" Equal Protection claim is not predicated on a determination that plaintiffs have a liberty interest in conjugal visits and involves issues that were not implicated in the previous action. Accordingly, it is not barred by the doctrine of collateral estoppel.

12. As a preliminary matter, to the extent that plaintiffs allege that defendants denied them the right to marry, which is apparently alleged in the Complaint, this claim is dismissed because defendants lacked any involvement with respect to the Town Clerk's

prerequisite to plaintiffs' Due Process claim is that they have a protected liberty interest in the exercise of either proposed right. *See Palmer v. Richards*, 364 F.3d 60, 64 n. 2 (2d Cir.2004) ("[The plaintiff] ha[s] 'no right to due process at his hearing *unless* a liberty interest' was infringed as a result.'" (alterations in original removed; alterations added) (quoting *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir.1998) (per curiam))); *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994) ("As a threshold matter, we must determine whether [the plaintiff] has a protected liberty interest in the right to ... conjugal visits in prison."); *Henry v. Coughlin*, 940 F.Supp. 639, 643 (S.D.N.Y.1996) ("To establish a [Due Process] claim, a plaintiff must show that a liberty interest exists.").

It is well established that "there is no liberty interest in participating in the Family Reunion Program" or in conjugal visits. *See Palmer*, 364 F.3d at 64 n. 2; *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996); *Hernandez*, 18 F.3d at 137 ("The Constitution ... does not create any protected guarantee to conjugal visitation privileges while incarcerated.... [E]ven though the right to marriage is constitutionally protected for inmates, the right to marital privacy and conjugal visits while incarcerated is not."); *see also Doe v. Coughlin*, 71 N.Y.2d 48, 54, 523 N.Y.S.2d 782, 518 N.E.2d 536, 540 (1987), *cert. denied*, 488 U.S. 879, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988) (holding that neither a prisoner nor his spouse has a constitutional right to conjugal visits); *Payne v. Goord*, 12 A.D.3d 733, 734, 783 N.Y.S.2d 702, 703 (3d Dep't 2004) ("[P]articipation in the FRP is a privilege, not a right ...." (internal citations omitted)).

However, "a state can create a liberty interest by adopting a regulatory scheme that creates a legitimate expectation in the inmate for a particular right." *Henry*, 940 F.Supp. at 643 ("If access to the specific program is based on objective criteria, an expectation may be created; however, if access to the program is based on subjective factors no expectation and hence no right arises.") (citing *Doe*, 71 N.Y.2d at 54–55, 523 N.Y.S.2d 782, 518 N.E.2d at 539–40; *Hernandez*, 18 F.3d at 137 ("State law may create protected liberty interests for prisoners ... where our close examination of the relevant state statutes and regulations shows that the state has placed 'substantive limitations on official discretion[.]' ")).

The Second Circuit has, on multiple occasions, held that no "state-created liberty interest" exists in participating in the FRP or in conjugal visits. *See Hernandez*, 18 F.3d at 137–38 (internal citations omitted) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989), *Olim v. Wakinekona*, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)) ("The fact that New York State's penal system has allowed for inmates to take part in conjugal visits with their spouses in no way establishes a constitutional right of marital intimacy for those privileges."); *see also Palmer*, 364 F.3d at 64 n. 2; *Champion*, 76 F.3d at 486 ("The dismissal of [the plaintiff's] due process claim was proper because the state regulations permitting correctional facilities to allow conjugal visits to prisoners did not give [the plaintiff] a liberty interest in such visits."); *Henry*, 940 F.Supp. at 643. Similarly, the New York Court of Appeals has held that "[g]iven the present regulatory scheme of the Family Reunion Program, [prisoners and their families] could have no legitimate expectation that they would

issuance and subsequent nullification of

plaintiffs' marriage license. *See supra* n. 7.

be afforded conjugal visits." *Doe,* 71 N.Y.2d at 55, 523 N.Y.S.2d 782, 518 N.E.2d at 541. The courts have reasoned that the application process of the FRP is highly subjective and "heavily discretionary and holds out no more than the possibility of conjugal visits." *Id.* at 56, 518 N.E.2d at 541; *see also Hernandez,* 18 F.3d at 138 ("The evaluation of whether or not that opportunity should be granted to a prisoner once he is in a facility that has developed such a program is 'committed to the considered judgment of prison administrators, "who are actually charged with and trained in the running of the particular institution under examination.' " ").

The FRP selection process involves such highly discretionary and subjective considerations as whether "[t]he inmate has exhibited a pattern of good institutional adjustment" and "has participated in programs that address his[ ] academic and vocational needs, as well as issues related to his[ ] instant offense and overall history." *See* N.Y. COMP.CODES R. & REGS., TITLE 7, § 220.2.; *see also Doe,* 71 N.Y.2d at 56 n. 1, 523 N.Y.S.2d 782, 518 N.E.2d at 541 n. 1 (listing fifteen factors that are considered in the FRP application process); *Georgiou v. Daniel,* 21 A.D.3d 1230, 1231, 801 N.Y.S.2d 421, 423 (3d Dep't 2005) (explaining that the application process to the FRP is highly discretionary and includes balancing a number of factors, including the prisoner's security classification, his behavioral history and the nature of his underlying conviction). Furthermore, facilities are not required to implement the FRP and, once implemented, prison officials retain ultimate discretion in administering the program. *See Hernandez,* 18 F.3d at 137. Accordingly, plaintiffs have no liberty interest in their participation in the FRP or in conjugal visits, whether grounded in the Constitution or created by virtue of New York's regulatory scheme. Consequently, plaintiffs' Due Process claims must be dismissed. *See, e.g., Johnson v. N.Y. City Police Dep't,* 25 Fed. Appx. 32, 33 (2d Cir.2001) ("To prevail on a substantive and procedural due process claim under the Fifth and Fourteenth Amendments, [the plaintiff] must demonstrate that he was deprived of a protected property or liberty interest.").

## IV. *Denial of Fundamental Right in Violation of Equal Protection Claim*

■ Next, plaintiffs claim that they were selectively denied the right to exercise their fundamental right to engage in the FRP program and to have conjugal visits in violation of the Equal Protection Clause of the Fourteenth Amendment.[13] However, the Second Circuit has held that prisoners do not have a fundamental right to participate in the FRP or to conjugal visits. *See Hernandez,* 18 F.3d at 137. For the aforesaid reasons, plaintiffs have no liberty interest *at all* in conjugal visits or participation in the FRP. *See supra* pp. 271–72. Accordingly, their Equal Protection claim based on the selective denial of a fundamental right must fail.

## V. *"Class–of–One" Equal Protection Claim*

■ Lastly, plaintiffs assert that defendants discriminated against them by selectively denying them conjugal visits pursuant to the FRP in violation of the Equal Protection Clause. Because plaintiffs have not alleged membership in a protected class and have not been denied a fundamental right, plaintiffs' claim is a "class-of-

---

**13.** Again, to the extent that plaintiffs allege that defendants denied them the fundamental right to marry, the claim is dismissed because defendants had no involvement in the nullification of their marriage license. *See supra* nn. 7, 10.

one" Equal Protection claim. *See Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir. 2005) (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000)); *Champion,* 76 F.3d at 486. In order to state a "class-of-one" claim, a plaintiff must show that he "has been treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech,* 528 U.S. at 564, 120 S.Ct. 1073; *see also Chestnut Ridge Assocs., LLC v. Vill. of Chestnut Ridge,* 194 Fed. Appx. 76, 77 (2d Cir.2006); *Neilson,* 409 F.3d at 105. In order to succeed on this claim, "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson,* 409 F.3d at 105 (citing *Purze v. Vill. of Winthrop Harbor,* 286 F.3d 452, 455 (7th Cir.2002)). Indeed, the similarity between the plaintiff and the alleged similarly situated individuals must be *"prima face* identical." *Neilson,* 409 F.3d at 105, 106 ("Where a plaintiff in a class of one equal protection case relies on similarity alone, a more stringent standard must be applied than is applied in a racial discrimination case."); *see also Baum v. Rockland County,* 161 Fed.Appx. 62, 65 (2d Cir.2005) ("For such a claim to meet with success, 'the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high'...."). To this end, the plaintiff must demonstrate that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." *Neilson,* 409 F.3d at 105; *see also Williams v. Wright,* 162 Fed. Appx. 69, 70 (2d Cir.2006). "Generally, whether parties are similarly situated is a fact-intensive inquiry." *Clubside, Inc. v. Valentin,* 468 F.3d 144, 159 (2d Cir.2006). "A court may grant summary judgment in a defendant's favor on the basis of lack of similarity of situation, however, where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Id.; see also Cohn v. New Paltz Cent. Sch. Dist.,* 171 Fed.Appx. 877, 880 (2d Cir.2006).

 In the present case, plaintiffs allege that defendants treated them differently than similarly situated individuals by excluding them from the FRP without any rational basis. (*See* Complt. ¶ 49.) On their face, plaintiffs' allegations are sufficient to assert a "class-of-one" claim under the Equal Protection Clause. *See Cohn,* 171 Fed.Appx. at 879 ("[A]t the pleading stage, a complaint alleging a 'class of one' Equal Protection violation need not identify actual instances where others have been treated differently, and that it is sufficient to make the more general allegation that similarly-situated people have been treated differently, just as the Complaint does here."). However, plaintiffs and their counsel had more than a year for discovery before the present motion was filed and a number of months thereafter and still have presented no evidence that any other inmates were allowed conjugal visits after institutional officials were officially notified that their marriages were invalid. We have been given no basis for believing that plaintiffs could uncover any such evidence of disparate treatment even if they were allowed unlimited additional time for discovery.

In their Memorandum of Law, plaintiffs argue, for the first time, that "Briggs used the [Town Clerk's] illegitimate paperwork as a pretext for invidious discrimination in retaliation for complaints that ... Gordon had made against him." (*See* Pls. Mem. Opp. Summ. J. at 4.) Not only is plaintiffs'

Complaint devoid of any allegation of retaliation, but it is clear that no such allegation could be supported. Gordon's grievances against Briggs were not filed until after the termination of plaintiffs' participation in the FRP. (*See* Raum Decl., Ex. E.) Moreover, the record strongly contradicts plaintiffs' allegations of bad faith by establishing a compelling reason for termination of plaintiffs' conjugal visits: the apparent lack of a valid marriage. Although Judge Brieant properly questioned the propriety of the Town Clerk's nullification of plaintiffs' marriage, he did not validate the dubious Mexican divorce. Furthermore, defendants' reinstatement of plaintiffs' conjugal visits after learning of Judge Brieant's decision is persuasive evidence of their good faith.

Thus, we must now determine whether defendants' actions were rationally related to a legitimate government purpose. *See, e.g., Moore v. N.Y. State Dep't of Corr. Servs.,* 26 Fed.Appx. 32, 33 (2d Cir.2001). Defendants' requirement that plaintiffs show, through proper documentation, the validity of their marriage rationally furthers a legitimate government purpose. Enrollment in the FRP is limited and the approval process is highly selective. (*See* Briggs Decl. ¶ 3.) *See* N.Y. Comp.Codes R. & Regs., Title 7, §§ 220.1, 220.3. Limiting the privilege of conjugal visits to those who have documentation evidencing a legal marriage is eminently rational. Accordingly, plaintiffs "class-of-one" Equal Protection claim is dismissed.

### CONCLUSION

For the reasons stated above, the motion for summary judgment filed by defendants Raymond Cunningham and Thomas Briggs is granted in its entirety, and the Clerk's Office is directed to enter judgment in favor of all defendants dismissing the Complaint in its entirety, with prejudice and without costs or attorneys' fees.

SO ORDERED.